**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| JOHN THOMAS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TELIX PHARMACEUTICALS LTD., CHRISTIAN P. BEHRENBRUCH, DARREN SMITH, and KYAHN WILLIAMSON,<br><br>Defendants. | **Case No: 1:25-cv-02299-JRO**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 7

A. Plaintiffs .......... 7

B. Defendants .......... 7

C. Relevant Non-Parties .......... 8

IV. SUBSTANTIVE ALLEGATIONS .......... 9

A. Background .......... 9

B. Telix Knew the FDA Would Not Approve TLX101-CDx (Brain Agent) .......... 10

1. TLX101-CDx (Pixclara) for Brain Cancer Imaging .......... 10

2. Defendants Knew the FDA Found its Clinical Data Insufficient .......... 10

3. Defendants Made False and Misleading Statements About TLX101-CDx (Brain Agent) .......... 12

4. The FDA Rejects TLX101-CDx (Brain Agent), Causing the Telix Stock to Fall Damaging Investors .......... 13

C. The FDA Did Not Approve a Phase 3 Trial of TLX591 (Prostate Drug) .......... 14

1. TLX591 For the Treatment of Prostate Cancer .......... 14

2. Telix Misleads Investors as to the "Phase 3" Status of TLX591 (Prostate Drug) .......... 15

3. The Formal SEC Investigation is Revealed; Telix Stock Drops Damaging Investors .......... 17

4. The Aftermath of the Announced SEC Investigation .......... 18

5. Defendants' Post-Class Period Statements Prove Class Period Statements Were Misleading ........ 19

D. Telix Misrepresents TLX250 (Kidney Agent) Risks ........ 22

1. Background - First FDA Rejection ........ 22

2. Defendants Ignore the FDA's Recommendations ........ 23

3. Prior to Resubmission in December 2024, Telix Employees Presented Behrenbruch with a List of the Risks to FDA Approval ........ 23

4. Telix Resubmits the TLX250 BLA (Kidney Agent) ........ 25

5. The Second FDA Rejection of TLX250 (Kidney Agent) ........ 27

6. Telix Knew it had a Comparability Problem Between the Trial Drug and Commercial Product, Highlighted by Particulates in the Solution ........ 28

7. Telix Knew of the Problems at GBI ........ 31

8. Telix Knew of the Problems at 3DI ........ 33

9. Telix is Still Working to Address the FDA's Concerns ........ 36

E. The "Pump-and-Dump" Scheme ........ 36

F. Defendant Behrenbruch's Stock Sales Triggered a Duty to Disclose ........ 41

V. DEFENDANTS' MISREPRESENTATIONS ........ 42

VI. LOSS CAUSATION ........ 67

VII. ADDITIONAL SCIENTER ALLEGATIONS ........ 72

A. Defendants Were Motivated to Conceal the Truth While Telix's Co-Founders Sold Four Million Shares ........ 73

B. Behrenbruch's Refusal to Heed Expert Advice Can Best Be Explained by Fraudulent Intent ........ 74

C. Defendant Behrenbruch was a "Very Hands-on CEO" ........................................ 75

D. Defendant Behrenbruch was Debriefed After Every FDA Meeting..................... 76

E. The FDA was in Regular Contact With Telix .................................................... 76

F. Telix's Pipeline Drugs Were of Critical Importance to the Company.................. 77

VIII. CLASS ACTION ALLEGATIONS ..................................................................... 77

IX. CAUSES OF ACTION ........................................................................................ 80

X. PRAYER FOR RELIEF ........................................................................................ 83

XI. JURY TRIAL DEMANDED.................................................................................. 84

Court-appointed co-Lead Plaintiffs Tracy Tripp and Song Chee Tan ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Telix Pharmaceuticals Ltd. ("Telix" or the "Company"), and information readily obtainable on the Internet, as well as through interviews of former employees of the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Telix American Depository Shares ("ADSs") between November 14, 2024 and August 28, 2025, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. The Class Period begins on November 14, 2024, with the commencement of trading in Telix ADSs on the Nasdaq Global Select Market. Prior to that date, Telix shares traded only on the Australian Securities Exchange.

3. Telix is a biopharmaceutical company and Defendant Behrenbruch is Telix's CEO. Defendants misled investors regarding Telix's three most important drug candidates so that

Defendant Behrenbruch could sell two million shares of his Telix stock at artificially inflated prices. ***First***, Defendants touted the abilities of Telix's investigation agent for the imaging of brain cancer (TLX101-CDx (Pixclara), or the "Brain Agent"), even though the Food and Drug Administration (the "FDA") had already told the Company the clinical data in its New Drug Application ("NDA") did not provide substantial evidence of effectiveness. When the FDA rejected the Brain Agent NDA on April 25, 2025, the Company's ADSs dropped from $18.80 to $17.57. ***Second***, Defendants asserted Telix's prostate cancer treatment (TLX591, or the "Prostate Drug") had commenced Phase 3 trials, but the FDA had not authorized a full Phase 3 trial. When Telix announced on July 22, 2025, it had been subpoenaed by the Securities and Exchange Commission (the "SEC") regarding these statements, the stock price dopped from $16.28 to $13.89. ***Finally***, Defendants omitted to disclose material deficiencies in Telix's Biologics License Application ("BLA") for the Company's kidney cancer imaging agent (TLX250-CDx (Zircaix), or the "Kidney Agent"). According to a former high-level Telix employee, Defendant Behrenbruch knew all about these material ***undisclosed*** deficiencies but insisted on pushing the BLA regardless. When Telix announced the FDA rejected the Kidney Agent BLA on August 28, 2025, Telix ADSs declined from $12.10 to $9.55. Defendant Behrenbruch sold his two million Telix shares on February 27, 2025 before the truth was disclosed, when the Company's ADSs traded in the range of $18.60 to $19.30.

4. Prior to the Class Period, on October 17, 2024, Telix filed a Form 20-F registration statement with the SEC containing false and misleading statements about the Company's Prostate Drug. Though Telix boasted about its Prostate Drug being in Phase 3 trials in the United States, the FDA had not actually authorized a full Phase 3 trial. The FDA had only authorized the first

part of the two-part Phase 3 trial. These false statements caused the ADSs to trade at artificially inflated prices from the moment they began trading on the NASDAQ on November 14, 2024.

5. On February 20, 2025, Telix reported its full year 2024 financial results and updated the market on its new cancer drugs. Investors were keenly attuned to the new drug pipeline and Telix highlighted the planned commercial launches of Telix's Kidney Agent and Brain Agent, as well as reporting on its Prostate Drug.

6. In Telix's 2024 Annual Report issued the same day, the Company's founder and CEO Christian Behrenbruch proudly provided the market with good news: Telix's "new drug applications . . . have the potential to significantly impact the standard of care ***while super-charging Telix's cash generation capability.***"[1] Behrenbruch's assessment was unabashedly positive, Telix had "***built a strong foundation over the last few years, and with several major inflection points achieved in 2024, we are on the cusp of exponential growth***." The news was bullish, and the market reacted accordingly with the ADSs increasing from a close of $17.41 prior to the statements to close at $20.93 two days later.

7. Over the next several days, Telix issued two additional press releases announcing purported milestones for its pipeline drugs. On February 25, 2025, Telix reported that it had begun dosing patients in its Phase 3 trial of TLX591 (Prostate Drug). On February 26, 2025, Telix announced the FDA had accepted the Company's BLA for Telix's key imaging agent TLX250-CDx (Kidney Agent), "paving the way for a U.S. commercial launch in 2025."

[1] Unless otherwise stated, all emphasis is added.

8. One day later, on February 27, 2025, Defendant Behrenbruch and his co-founder Andreas Kluge each sold two million Telix shares for $29.50 per share Australian for a total of $118 million Australian (over $73 million American). (The sale was at a discount to the closing market price on the Australian Securities Exchange where Telix common shares trade, a standard practice for block trades.) Behrenbruch and Kluge's timing was impeccable, as is indicated in the chart of the common shares below.




9. This sale was unusual, as a diligent search found that neither Behrenbruch nor Kluge had sold any shares since January 2022. Further, their timing was not mere luck. Behrenbruch knew something the market didn't. He traded on the basis of material non-public inside information. Defendants' statements were false and misleading and calculated to enable Behrenbruch to sell a massive portion of his holdings for significantly more than the stock would be worth when the truth was eventually revealed.

10. Contrary to Defendants' public statements, Defendants knew Telix's drug pipeline was not what they had portrayed it to be. For instance, on April 25, 2025, the FDA rejected Telix's application for approval of TLX101-CDx (Brain Agent) because the "clinical data submitted in

this application did not provide substantial evidence of effectiveness." Investors were surprised, and the ADSs declined from $18.80 to $17.57. Defendants were not. The FDA had already told Telix of "any issues that could preclude an approval action" at the mid-cycle meeting in early February 2025. *See* § IV.B.

11. Further, contrary to Defendants' statements to investors, the FDA had not authorized a full Phase 3 clinical trial of TLX591 (Prostate Drug). The FDA only approved a portion of the Phase 3 trial. Defendants' statements on the subject were so misleading that the SEC authorized a formal investigation of Telix. When announced to investors on July 22, 2025, this caused Telix ADSs to drop from $16.28 to $13.89. The SEC formal investigation remains ongoing. *See* § IV.C.

12. Finally, Defendants knew the TLX250-CDx (Zircaix) (Kidney Agent) BLA was plagued by material deficiencies prior to Telix submitting it to the FDA in December 2024. On August 28, 2025, Telix announced that the FDA rejected the BLA. The announcement shocked the market causing Telix ADSs to drop from $12.10 to $9.55, off 21%. The FDA was troubled by a change in the manufacturing process that created particulates in the drug solution, a problem that Defendants knew about since the first half of 2024. Further, the FDA found deficiencies at two third-party manufacturers that required remediation. Prior to submitting the BLA in December 2024, Telix had documented serious concerns at both third-party manufactures, and conducted a mock audit of one of them that discovered such significant deficiencies that a senior level Telix employee urged Defendant Behrenbruch to find another provider. Behrenbruch refused to do so. *See* § IV.D.

13. Defendants chose to speak about Telix's drug pipeline. The federal securities laws prohibit them from omitting information that made their affirmative statements misleading. Not

only did Defendants omit material information making their statements misleading, but Defendant Behrenbruch had a duty to disclose any material non-public information known to him before he could sell Telix shares. Defendant Behrenbruch remained silent and sold two million shares of Telix stock at artificially inflated prices netting proceeds of $59 million Australian. He substantially benefited by breaking the law. Plaintiffs were not so lucky.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. According to Telix's 2024 Form 20-F filed with the SEC on February 24, 2025, the "majority of [Telix's] workforce is in the United States, based out of our U.S. headquarters in Indianapolis, Indiana. . . ."

17. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

### A. Plaintiffs

18. Plaintiffs, as set forth in their previously-filed Certifications (ECF Nos. 10-1 and 14-3), acquired Telix ADSs at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures and materialization of the misrepresented risks.

### B. Defendants

19. Defendant Telix is a biopharmaceutical company focused on the development and commercialization of therapeutic and diagnostic radiopharmaceuticals and associated medical technologies. Telix is incorporated in Australia, and its U.S. headquarters are in Indianapolis.

20. Telix American Depositary Shares ("ADS" or "ADSs") trade on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "TLX". Telix "ordinary shares" or "common shares" have been listed on the Australian Securities Exchange, or ASX, since November 2017. Each Telix ADS represents one ordinary share. Telix ADSs trade in American dollars and the ordinary shares trade in Australian dollars. Unless otherwise noted, all ADS references are in American dollars and common share or ordinary share references are in Australian dollars.

21. Defendant Christian P. Behrenbruch ("Behrenbruch") served as the Company's Chief Executive Officer ("CEO") at all relevant times. He co-founded Telix and is its executive director.

22. Defendant Behrenbruch:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

23. Telix is liable for the acts of Defendant Behrenbruch and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24. The scienter of Defendant Behrenbruch and other employees and agents of the Company is similarly imputed to Telix under *respondeat superior* and agency principles.

25. Defendant Telix and Defendant Behrenbruch are collectively referred to herein as "Defendants."

**C. Relevant Non-Parties**

26. Dr. Andreas Kluge co-founded Telix with Defendant Behrenbruch and served as a director of the Company from its inception in 2017 until October 17, 2024. Dr. Kluge sold two

million ordinary shares of Telix stock on February 27, 2025, for $29.50 (Australian) per ordinary share, as described herein. Kluge continued to work for Telix as a consultant after retiring from the Board of Directors.

27. Former Employee Number 1 ("FE-1") was the Senior Vice-President of Global Manufacturing at Telix Pharmaceuticals from November 2023 to August 2025, and the VP of Commercial Manufacturing from April 2023 to October 2023. FE-1 was in charge of the global team at Telix responsible for drug development and manufacturing. FE-1 oversaw supply chain and logistics for drug delivery. FE-1 reported to Group Chief Operating Officer Darren Patti. As detailed herein, FE-1 dealt directly with CEO Behrenbruch on a regular basis. FE-1 participated in meetings with the FDA, and/or participated in team debriefings that occurred directly after Telix had meetings with the FDA. James Stonecypher, Telix's Chief Development Officer, typically attended FDA meetings on behalf of Telix, and then immediately debriefed senior Telix executives including FE-1 and Defendant Behrenbruh. As a result of the Chemistry, Manufacturing, and Controls ("CMC") issues with TLX250-CDx (Zircaix) (Kidney Agent), FE-1 was significantly involved in the BLA for the Kidney Agent. FE-1 has 30 years of experience working in drug manufacturing and has been a part of numerous NDAs and BLAs at different companies. FE-1 never experienced so many CMC issues on one BLA/NDA as Telix did with the Kidney Agent.

## IV. <u>SUBSTANTIVE ALLEGATIONS</u>

### A. <u>Background</u>

28. Telix is a biopharmaceutical company focused on sales, development and commercialization of therapeutic and diagnostic radiopharmaceuticals.

29. Radiopharmaceuticals are a class of drugs that combine radioactive isotopes with biological molecules to target, diagnose and treat specific diseases. The combination of a targeting

agent with radioactive isotope allows, at least in theory, precise delivery of radiation to the tumor while minimizing harm to surrounding healthy tissue.

## B. Telix Knew the FDA Would Not Approve TLX101-CDx (Brain Agent)

### 1. TLX101-CDx (Pixclara) for Brain Cancer Imaging

30. TLX101-CDx (Pixclara) (Brain Agent) is an investigation agent for the imaging of glioma, a rare and life-threatening brain cancer. In October 2020, TLX101-CDx was granted orphan drug designation by the FDA in the United States for the imaging of glioma.

31. In August 2024, Telix submitted an NDA to the FDA for TLX101-CDx for the characterization of progressive or recurrent glioma from treatment related changes in both adult and pediatric patients through the 505(b)(2) NDA regulatory pathway.

32. In October 2024, the FDA accepted the NDA, granted priority review and assigned a PDUFA goal date of April 26, 2025.

33. TLX101-CDx was granted fast track designation by the FDA for this indication in April 2024.

34. The FDA rejected TLX101-CDx in April 2025.

### 2. Defendants Knew the FDA Found its Clinical Data Insufficient

35. On April 25, 2025, the FDA issued a Complete Response Letter ("TLX101 CRL") to Telix rejecting its application for approval of TLX101-CDx (Brain Agent). The TLX101 CRL made clear that Telix's trial did not achieve statistically significant results in diagnosing the target cancer. The TLX101 CRL stated:

> ***The clinical data submitted in this application did not provide substantial evidence of effectiveness*** for floretyrosine F 18 [TLX101]. The efficacy study, 18F-TLX101-CDx-203, was considered adequate and well-controlled ***but demonstrated borderline diagnostic performance with lower bounds of the 95% confidence intervals ranging from 58% to 73% sensitivity and from 36% to 51% specificity across three blinded central readers***. In addition, it was a single center study and

had potential for bias in reference standard determination, further limiting its persuasiveness.

36. The TLX101 CRL was not publicly available at the time it was issued. However, a redacted version of the TLX CRL was later posted on the FDA's website. The publicly available version of the TLX CRL is attached hereto as Exhibit A.

37. The April 25, 2025 TLX101 CRL did not come as a surprise to Defendants. The FDA communicated its concerns to Telix numerous times and for months prior to issuing the TLX101 CRL.

38. The FDA maintains strict requirements for communications to sponsors of drug applications granted priority review such as Telix's TLX101-CDx submission. These requirements are set forth in the FDA's "Review Process Desk Reference Guide" for NDAs. *See* Ctr. for Drug Eval. & Rsch., CDER 21st Century Review Process Desk Reference Guide: New Drug Application and Biologics License Application Reviews ("CDER Review Process") available at https://www.fda.gov/media/78941/download.

39. The FDA review team holds an internal mid-cycle meeting within 3 months of accepting an NDA for priority review – and then conveys an update to the applicant within two weeks of that mid-cycle review meeting. *Id*. at 28-30. At the mid-cycle meeting, the FDA review team's objectives include: "***Identify any issues that could preclude an approval action***." *Id.* at 28. The review team is generally expected to update the applicant on the review process within two weeks of the mid-cycle meeting and inform the applicant of "[a]ny significant issues identified by the review team to date." *Id*. at 30.

40. This mid-cycle FDA communication of "any issues that could preclude an approval action" to Telix would have occurred no later than three months and two weeks after the FDA

accepted the NDA for TLX101-CDx (Pixclara) on October 24, 2024 – which would have been early February 2025.

41. After the mid-cycle meeting, the CDER Review Process specifically required (i) a "late-cycle meeting" between Telix and the FDA at least two months prior to the April 26, 2025 PDUFA date—late February 2025, and (ii) a "background package" for the late-cycle meeting be provided by the FDA to Telix not less than 12 days prior to that late-cycle meeting – or mid February 2025. *See* CDER Review Process at 39-40. "***The late-cycle meeting is intended to share information [and] identify deficiencies*** . . . ." *Id*. at 40. The background package would have specifically identified the "[m]eeting agenda" and "[s]ubstantive application issues." *Id.*

42. The FDA would have notified Telix of the deficiencies identified in the April 25, 2025, Complete Response Letter via the background package and late-cycle review meeting before Defendants' false and misleading statements in the February 20, 2025, press release, conference call and Annual Report, and before Telix's co-founders sold four million Telix shares on February 27, 2025.

### 3. Defendants Made False and Misleading Statements About TLX101-CDx (Brain Agent)

43. Until April 25, 2025, when the FDA rejected the NDA for TLX101-CDx (Pixclara), Defendants made misleading statements about launching TLX101. For example, as detailed herein at Section V detailing all of Defendants' false and misleading statements, the Company's press release and Annual Report published on February 20, 2025, both indicated that Telix anticipated commercial launch of TLX101-CDx (Pixclara) in 2025.

44. Similarly, during the Company's February 20, 2025 conference call after the press release and annual report were published, Telix told investors:

> [G]lobal expansion of Telix's industry leading precision medicine portfolio is a key driver of our growth strategy. ***In the U.S. our commercial portfolio will continue to expand with the launches of our urology products Gozellix and Zircaix, followed by Pixclara*** for our neuro franchise.
>
> * * *
>
> Finally, ***our Pixclara agent will bring to neurology customers a technology that will quickly identify treatment related inflammation from tumor progression or pseudo progression and determine the best treatment pathway for the patient.***

45. On February 24, 2025, Telix filed a Form 20-F annual report that misleadingly described the trial data for TLX101-CDx, claiming its "***trials provided evidence*** that TLX101-CDx tended to result in higher sensitivity and specificity" than magnetic resonance imaging and MRI. (*See* ¶ 223 for full quoted text.)

46. As Defendants already knew at the time of these statements, the FDA had found the trial data in the NDA for TLX101-CDx (Pixclara) "***did not provide substantial evidence of effectiveness***." Accordingly, there was no reasonable basis to state that Telix anticipated launching TLX101 (Pixclara) in 2025 or that it would expand the Company's commercial portfolio in the U.S., and it was misleading for Defendants to assert the TLX101 (Pixclara) trial data "provided evidence" that TLX101-CDx was better than alternative methods of imaging.

#### 4. The FDA Rejects TLX101-CDx (Brain Agent), Causing the Telix Stock to Fall Damaging Investors

47. On April 28, 2025, Telix posted an announcement on its website entitled "Telix Provides Regulatory Update on TLX101-CDx" announcing the Company had received a Complete Response Letter from the FDA requiring Telix to provide "additional confirmatory clinical evidence" to "progress the application."

48. The market reaction to news of the TLX101 CRL was significant. Telix ADSs declined from a close of $18.80 on April 25, 2025, to close at $17.57 on the next trading day April 28, 2025.

49. Telix did not launch TLX101 (Pixclara) in 2025. Telix did not resubmit an application for Pixclara to the FDA for approval until March 16, 2026. The deficiencies in the original application were material and the delays significant to the Company's ability to monetize its capital investment in the research and development of the Brain Agent.

## C. The FDA Did Not Approve a Phase 3 Trial of TLX591 (Prostate Drug)

### 1. TLX591 For the Treatment of Prostate Cancer

50. In February 2025, Telix described TLX 591 in the Company's Form 20-F filing with the SEC as its "lead therapeutic product candidate." Telix claimed TLX591 "has the potential to deliver improved patient outcomes with an efficient dosing regimen."

51. The stated belief from Telix was that TLX591 has a number of advantages over the current radiopharmaceutical prostate therapeutic (Pluvicto), including a short, patient-friendly dosing regimen that delivers a meaningful therapeutic index and low occurrence of the off-target side effects that are common with currently marketed small molecule PSMA radiopharmaceuticals.

52. TLX591, unlike Pluvicto, utilizes a novel antibody approach to target cancer cells. TLX591 combines a radioactive isotope (lutetium-177) with the antibody rosopatamab, which targets PSMA (prostate-specific membrane antigen).

53. According to Telix's Form 20-F filed with the SEC: "Our prostate cancer programs target PSMA, a well-validated protein target for the delivery of both therapeutic and diagnostic radiopharmaceuticals that is highly expressed on prostate cancer cells with low expression on

healthy cells." The antibody (along with the radiation) attaches to the PSMA on the tumor cell, and the radiation is delivered directly to the cancer.

**2. Telix Misleads Investors as to the "Phase 3" Status of TLX591 (Prostate Drug)**

54. Prior to and during the Class Period, Defendants misled investors about the FDA's approval of Telix's Phase 3 trial of TLX591 referred to as ProstACT Global.

55. When the FDA approved ProstACT Global Phase 3 to commence enrollment in the U.S., the approval was only for the first part of the trial, which was similar to a Phase 2 study to determine drug safety and proper dosage ("Part 1").

56. Before Telix could commence "Part 2" of the ProstACT Global Phase 3 trial, which would test for efficacy and was more akin to a standard Phase 3 trial, Telix would have to first present the safety data from Part 1 to the FDA and obtain FDA approval to move forward with Part 2.

57. The FDA's requirement that Telix obtain the FDA's approval before moving to Part 2 of the Phase 3 trial is not normally required in a Phase 3 trial. Most Phase 3 trials run straight through.

58. The FDA did not give Telix approval for a full Phase 3 trial. Nonetheless, Defendants repeatedly represented that Telix had approval for a full Phase 3 trial.

59. For instance, prior to the Class Period, on August 22, 2024, Telix issued a press release stating: "For the Phase III ProstACT GLOBAL trial (TLX591), the Investigational New Drug application was cleared by the U.S. Food and Drug Administration (FDA) and site activation commenced in the U.S." Similarly, in the Company's Form 20-F filed on October 17, 2024 with the SEC, Telix again told investors it had been approved for a Phase 3 trial in the United States – without disclosing that only the first part of the Phase 3 trial had been approved.

60. On February 20, 2025, Telix issued a press release announcing its 2024 financial results and achievements, held a conference call for investors, and publicly released its 2024 Annual Report. In all three, Telix falsely and/or misleadingly asserted it had been authorized to proceed with its Phase 3 ProstACT Global trial of TLX591, without disclosing that the FDA's approval had been limited to Part 1 of the trial. These statements are detailed *infra* at Section V.

61. On February 24, 2025, Telix filed its 2024 Form 20-F annual report with the SEC, and again falsely and/or misleadingly asserted it had been authorized to proceed with a Phase 3 trial of TLX591.

62. On February 25, 2025, just two days ***before*** Telix's co-founders sold four million shares, Telix issued a press release titled "Recruitment Spotlight: Phase 3 Clinical Trial of Novel Prostate Cancer Radiopharmaceutical Now Active in Miami." The press release stated:

> Telix Pharmaceuticals Limited (ASX: TLX, Nasdaq: TLX, Telix, the Company) announces that the Biogenix Molecular Research Center in Miami, FL, is recruiting and dosing patients in the ProstACT Global Phase 3 trial[1] of TLX591 for patients with advanced prostate cancer, as part of a wider United States (U.S.) roll-out.
>
> ProstACT Global is trialling a promising new treatment option for prostate cancer, which is the most commonly diagnosed cancer and the second leading cause of cancer-related death for U.S. men. This month, Biogenix Molecular Research Center successfully administered two doses of TLX591, 14 days apart, to a local Miami-based patient, and continues to recruit eligible patients in the Miami area.
>
> [1] ClinicalTrials.gov ID: NCT06520345.

63. The February 25, 2025, press release misrepresented that the FDA had authorized a full Phase 3 trial of TLX591, and failed to reveal that the FDA had expressly conditioned Telix's ability to proceed to Part 2 of the trial on FDA review and approval of the Part 1 data.

### 3. The Formal SEC Investigation is Revealed; Telix Stock Drops Damaging Investors

64. On July 22, 2025, before the market opened, Telix issued a press release and filed with the SEC a current report on Form 6-K. Attached to the current report was a copy of the press release. In pertinent part, it stated the following:

> Telix has received a subpoena from the [SEC] seeking various documents and information primarily relating to the Company's disclosures ***regarding the development of the Company's prostate cancer therapeutic candidates***.
>
> The Company is fully cooperating with the SEC and is in the process of responding to the information request. At this stage, this matter is a fact-finding request. The Company has elected to notify the Australian Securities and Investments Commission of the SEC's information request. Telix's policy is not to discuss any details of an ongoing regulatory inquiry.
>
> * * *
>
> While the matter is ongoing, Telix will continue with its clinical development programs relating to its prostate cancer therapy candidates, in the ordinary course of business. The information requested does not extend to Telix's commercial and late-stage precision medicine products including Illuccix, Gozellix, Zircaix, Pixclara and Scintimun®[.]

65. On July 22, 2025, after market close, *Bloomberg* published an article entitled "Telix Shares Drop as SEC Probes Disclosures Tied to Prostate Cancer Drug Pipeline." This article stated that "[Telix] slumped as much as 16%, the most in 21 months, after the Australian developer of radioactive drugs said it received a subpoena from the [SEC] seeking information about disclosures related to its prostate cancer therapeutic candidates."

66. The market understood the SEC's investigation and subpoena to concern Telix's disclosures regarding the development of its prostate cancer therapeutic candidate TLX591.

67. The fact that the SEC served a subpoena upon Telix indicates the SEC was not merely conducting an informal inquiry but had commenced a formal investigation. The SEC

cannot issue subpoenas without a formal order of investigation. A formal order of investigation necessarily means the SEC has reason to believe Telix may have violated federal securities law.

68. On this news, Telix ADSs fell $1.70/ADS, or 10.4%, to close at $14.58 on July 23, 2025. The next day, Telix ADSs fell a further $0.69/ADS, or 4.7%, to close at $13.89 on July 24, 2025.

69. Defendants did not correct the record in July 2025 by publicly and clearly disclosing that the FDA had only authorized Part 1 of the Phase 3 trial.

**4. The Aftermath of the Announced SEC Investigation**

70. Telix did not immediately correct investors' confusion over the need for FDA approval to proceed to Part 2 of the ProstACT Global Phase 3 trial. After the Class Period, on December 8, 2025, Telix issued a press release titled "ProstACT Global Phase 3 Update: First Patient Dosed in Randomized Treatment Expansion, Part 1 Readout Plans Confirmed." The press release explained that Telix was going forward with Part 2 of the trial in certain countries but could not proceed to Part 2 in the United States. The press release further stated: "***As previously agreed with FDA and disclosed to the market, Telix will submit Part 1 data to the United States (U.S.) Food and Drug Administration (FDA) to enable clearance to expand Part 2 of the trial to U.S. sites***. A public disclosure of preliminary results from Part 1 of the study will be aligned to engagement with the FDA."

71. On December 17, 2025, Telix issued a press release titled "ProstACT Global Study: Status," which stated:

> Telix Pharmaceuticals Limited (ASX: TLX, NASDAQ: TLX, "Telix") today provides an update to confirm the current status of the ProstACT Global Phase 3 study of its lead prostate cancer therapy candidate TLX591. . . . This announcement is provided in response to inaccurate information in market circulation.

* * *

> Preparation is now underway to complete data lock and read-out. This includes data from each of the three cohorts in Part 1, including the docetaxel cohort which was the final cohort to complete enrolment. ***As previously disclosed[2], data from Part 1 will be presented to the United States (U.S) Food and Drug Administration (FDA) to ascertain eligibility for U.S. patients to participate in the Part 2 (randomized treatment expansion) portion of the study. Preliminary results from Part 1 of the study will be publicly disclosed at the time of readout and engagement with the FDA***.
>
> [2] Telix ASX disclosure 8 December 2025.

72. The Telix December 17, 2025 press release included a footnote referencing the December 8, 2025 press release as evidence Telix had previously disclosed to the public that the Company was required to obtain FDA approval before enrolling US patients in Part 2 of the ProstACT Global phase 3 trial.

73. On this news, the price of Telix ADSs declined from $8.34 to $7.85, a drop of nearly 6%.

74. As of the filing of Telix's 2025 Annual Report on February 20, 2026, the SEC investigation is ongoing.

75. On March 10, 2026, Telix reported the safety and dosimetry data from Part 1 of the ProstACT Global phase 3 trial and announced: "Part 1 data ***will be presented*** to the United States (U.S.) Food and Drug Administration (FDA) to seek an Investigational New Drug (IND) amendment to progress Part 2 in the U.S."

### 5. Defendants' Post-Class Period Statements Prove Class Period Statements Were Misleading

76. A comparison of (i) Defendants' statements prior to when the SEC issued its subpoena to (ii) similar statements after the Class Period, demonstrate the misleading nature of Defendants' earlier statements.

77. On February 24, 2025, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2024 (the "2024 Form 20-F"). The 2024 Form 20-F stated the Company had authority to go forward with a Phase 3 trial of TLX591:

> We have not submitted any applications for regulatory approval or obtained regulatory approval for any of our therapeutic product candidates. Our most advanced therapeutic candidate, TLX591 ($^{177}$Lu-rosopatamab tetraxetan), is a lutetium-labeled radio antibody-drug conjugate, or rADC, ***which we are evaluating in a Phase 3 clinical trial in patients with advanced prostate cancer.*** We dosed the first patient in this clinical trial in November 2023 in Australia. ***We received authorization to conduct the trial in the United States in April 2024 and are actively dosing patients at multiple clinical trial sites.*** We cannot be certain that TLX591, or any of our clinical trials of our other therapeutic product candidates, will generate safety and efficacy data sufficient for regulatory approval in any jurisdiction.

78. After the Class Period, on February 20, 2026, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2025 (the "2025 Form 20-F"). The 2025 Form 20-F rewrote that section to indicate the Company only had authority to go forward with ***part 1*** of the Phase 3 study of TLX591:

> We have not submitted any applications for regulatory approval or obtained regulatory approval for any of our therapeutic product candidates. Our most advanced therapeutic candidate, TLX591-Tx (lutetium (Lu177) rosopatamab tetraxetan), is a lutetium-labeled radio antibody-drug conjugate ("rADC"), which we are evaluating in a ***two-part*** Phase 3 clinical trial in patients with advanced prostate cancer, called ProstACT Global. We dosed the first patient in this clinical trial in November 2023 in Australia. ***We received authorization to conduct Part 1 of the*** trial in the U.S. in April 2024 and completed target enrollment of 30 patients in August 2025. We dosed the first patient in ProstACT Global Part 2 (randomized treatment expansion) in Australia in December 2025. We cannot be certain that TLX591-Tx, or any of our clinical trials of our other therapeutic product candidates, will generate safety and efficacy data sufficient for regulatory approval in any jurisdiction.

79. The 2024 Form 20-F stated that Telix would proceed to the second portion of the Phase 3 ProstACT Global trial after finishing the first part, without any reference to the required FDA approval to do so.

> We are also investigating TLX591 in the Phase 3 ProstACT GLOBAL clinical trial. We expect this trial to enroll 30 patients in a dosimetry and safety lead-in portion in replicating the prior study using the product candidate specifications intended for commercial release ***and then proceed to a randomized treatment expansion portion, in up to approximately 490 patients***. The trial is a multi-national, multi-center, prospective, randomized, controlled, open label study designed to investigate and confirm the benefits and risks associated with TLX591 a high-affinity PSMA-targeted rADC that delivers DNA breaking radiation directly to PSMA-positive bone, nodal, or visceral metastases in patients with mCRPC. The trial will enroll patients that have PSMA-positive mCRPC who have experienced disease progression following treatment with an androgen receptor pathway inhibitor (abiraterone or enzalutamide) that was received in either the metastatic castration-sensitive prostate cancer or first-line mCRPC treatment setting. The primary endpoint of the randomized portion of the trial is radiographic progression-free survival and secondary endpoints include overall survival, objective response rate, time to first symptomatic skeletal events, PFS, PSA decline of more than 50%, quality of life and safety and tolerability.

80. After the Class Period, the 2025 Form 20-F clearly indicated Telix ***could not*** proceed to a randomized treatment expansion portion in Part 2 of the trial without first getting FDA approval:

> ProstACT Global is a randomized, multinational, multicenter, open-label Phase 3 trial for the treatment of PSMA-positive mCRPC patients in combination with the standard of care, compared to the standard of care alone. In August 2025, Part 1 of this trial, a dosimetry and safety lead-in portion, completed target enrollment of 30 patients. ***The results will be presented to the FDA to obtain their agreement for the commencement of the randomized treatment expansion arm (Part 2), in the U.S***. Part 2 already has regulatory approvals to commence in Australia, Canada, China, New Zealand, Singapore, South Korea, Türkiye and the United Kingdom. We dosed the first patients in Part 2 in Australia in December 2025, and are actively dosing patients at multiple clinical trial sites outside the U.S.

81. Unlike the 2025 Form 20-F, the 2024 Form 20-F did not disclose to investors that the FDA had only authorized Telix to proceed with Part 1 of the ProstACT Global trial of TLX591.

82. As is detailed *infra* at § V, Defendants made a number of false and misleading statements misrepresenting and/or implying that Telix had been authorized by the FDA to conduct the full Phase 3 ProstACT Global trial of TLX591.

83. Only after the SEC issued a formal subpoena to Telix regarding its statements to the public about the TLX591 trials, did the Defendants attempt in earnest to fix the false impression created by their misleading statements.

### D. <u>Telix Misrepresents TLX250 (Kidney Agent) Risks</u>

#### 1. Background - First FDA Rejection

84. TLX250-CDx (Zircaix) is used for kidney cancer imaging. TLX250 combines an antibody (girentuximab) and an isotope (Zirconium89) to enable the antibody to find and bind to a protein (CAIX) on kidney cancer cells, with the isotope on the kidney cancer cells being visible on a PET scan.

85. In May 2024, prior to the Class Period, Telix submitted a biologics license application ("BLA") to the FDA for TLX250-CDx (Zircaix). In July 2024, the FDA declined to review the BLA and issued a Refuse to File ("RTF") determination (the "First RTF"). An RTF determination is a response from the FDA following its preliminary review, communicating the FDA's determination that the application does not include all pertinent information and data. The FDA's denial of acceptance for filing was based on a filing concern related to demonstrating adequate sterility assurance during dispensing of TLX250 in the radiopharmacy production environment.

86. Telix's July 31, 2024 press release indicated the FDA "identified a filing issue in the Chemistry, Manufacturing and Controls (CMC) package. The specific filing concern relates to demonstrating adequate sterility assurance during dispensing of TLX250-CDx in the radiopharmacy production environment." The press release continued:

> Dr Christian Behrenbruch, Managing Director and Group Chief Executive Officer at Telix, stated, "TLX250-CDx is a breakthrough product and, if approved, would be the first targeted imaging agent for the non-invasive detection of renal cancer. We have been working closely with the FDA through the BLA rolling review due

to the novel nature of this product candidate and value the FDA's constructive feedback at this early stage in the process. ***We expect to be able to satisfy its requirements within a minimal time frame and continue to see a clear path to product commercialisation in 2025***."

**2. Defendants Ignore the FDA's Recommendations**

87. After the FDA rejected Telix's first BLA for TLX250, Telix had an opportunity to correct deficiencies discovered by the FDA. Telix did not do so.

88. According to FE-1, the FDA issued the First RTF in July 2024 because Telix did not have results for a sterility test of the antibody at the time of submission. Telix was still conducting the relevant sterility test, but Defendant Behrenbruch insisted that Telix submit the BLA anyway. The sterility test ultimately failed and the FDA cited it as the reason for the First RTF.

89. By the time Telix resubmitted the BLA for TLX250 in December 2024, the sterility test issue was addressed and the results were successful. This corrected the reason for the First RTF. However, when the FDA issued the First RTF in July 2024, the FDA also provided a list of ***other*** items that did not cause the RTF but were items the FDA suggested Telix address before resubmission.

90. According to FE-1, Telix did not address all of the FDA's recommendations prior to the resubmission December 2024.

**3. Prior to Resubmission in December 2024, Telix Employees Presented Behrenbruch with a List of the Risks to FDA Approval**

91. After the FDA rejected Telix's first BLA for TLX250 in July 2024, Telix had an opportunity to address risks raised by the Company's employees. Telix did not do so.

92. In late-2024, Telix employees created a list of top risks to FDA approval of TLX250. Before Telix resubmitted the BLA in late 2024, FE-1 attended a meeting at which Telix

VP and President of Global Drug Development Habi Soulaihi presented these risks to Defendant Behrenbruch. Telix COO Darren Patti and Telix Group Drug Chief Medical Officer David Cade were also in attendance, as well as other senior Telix employees.

93. One of the main risks identified on the list presented to Defendants Behrenbruch at this meeting was the existence of particulates within the liquid product to be administered to patients. “The particulates were always a top one [risk] we were worried about,” according to FE-1. “You can’t have visible particulates in an injectable product.”

94. Telix had uncovered the existence of the particulates in the solution in the first half of 2024, according to FE-1.

95. According to FE-1, the particulates risk was heightened because Telix had changed the process by which it manufactured TLX250 for commercial use compared to what it used for the clinical trial. “It was a new development as a result of the formulation change. The process changes created it.”

96. Once the particulates were discovered in the first half of 2024, according to FE-1, Telix leadership decided the particulates would not be a concern for patients. Top leadership decided they would deal with the particulates by changing the description of the product’s appearance in its BLA filing. In the earlier Investigational New Drug filing for the Company’s clinical trials of TLX250-CDx, the product’s “appearance specification” did not allow for particulates, and the product was described as a completely clear liquid. In the BLA filing, Telix changed the “appearance specifications” to now allow for a certain amount of particulates that are “inherent to the product.”

97. Clinical trials are designed to make sure a drug product is safe for the population that will be using that drug. When, as is the case here, the drug that is to be used by the general

population is somehow different than the drug that was tested in the clinical trials, there is an obvious red flag regarding whether the clinical trial data on safety can still be relied upon.

98. According to FE-1, one of the FDA's primary concerns and bases for rejecting TLX250 was patient safety related to these visible particulates in the injectable solution, particularly because the product was different than what had been used in the trials.

99. Another of the main risks identified on the list presented to Defendant Behrenbruch was the quality of the zirconium provided by a third-party manufacturer named 3DI. That risk remained on the list through the FDA's review of TLX250, according to FE-1. The Telix team that put together the risks list thought Telix did not have sufficient tests to prove the quality of the Zirconium to the FDA. This risk was difficult for Telix to address because "the 3DI owner didn't want to do anything additional," according to FE-1.

100. According to FE-1, Defendant Behrenbruch simply dismissed these risks: "Chris would justify them himself, [saying] Oh, it's ok. It's fine. It's fine." "It didn't matter what we said." "He was going to say push forward. Don't worry about it. It's fine. It was a strange way to operate." These risks ultimately resulted in the FDA's rejection of the TLX250 BLA in August 2025

**4. Telix Resubmits the TLX250 BLA (Kidney Agent)**

101. Despite not correcting deficiencies previously discovered by the FDA or addressing significant risks identified by its employees, Telix resubmitted its TLX250 BLA to the FDA in December 2024.

102. Defendants knew these risks when the Company resubmitted its BLA in late 2024. Telix announced the resubmission in a press release on December 30, 2024, but failed to disclose these material facts to investors.

103. On February 26, 2025, Telix issued a press release announcing the FDA had accepted its BLA for TLX250. The press release was effusive in its praise for TLX250. It stated:

> Telix today announces that the United States (U.S.) Food and Drug Administration (FDA) has accepted the Biologics License Application (BLA) for its breakthrough investigational kidney cancer PET[1] imaging agent TLX250-CDx (Zircaix®[2], $^{89}$Zr-DFO-girentuximab), granted a Priority Review and provided a PDUFA[3] date of 27 August 2025***, paving the way for a U.S. commercial launch in 2025***.
>
> If approved, TLX250-CDx will become the first commercially available imaging agent to accurately and non-invasively diagnose and characterize clear cell renal cell carcinoma (ccRCC), the most common and one of the most aggressive sub-types of kidney cancer. It works by specifically binding to carbonic anhydrase IX (CAIX), a validated target protein expressed on 95% of ccRCC cells to produce images with high tumor-to-background ratio and high intra- and inter-reader consistency.
>
> The BLA is based on Telix's successful global Phase 3 ZIRCON[4] study, which demonstrated a sensitivity of 86%, specificity of 87% and a positive predictive value (PPV) of 93% for ccRCC, including in very small, difficult-to-detect lesions[5]. The results of this study were published in The Lancet Oncology in September 2024, in a peer-reviewed manuscript by Professor Brian Shuch (University of California, Los Angeles, UCLA) and colleagues[6]. The paper outlines the critical unmet need for a new, non-invasive technique that can accurately detect and differentiate ccRCC from other renal masses in patients and concluded that TLX250-CDx meets this need and 'has the potential to be practice changing.'
>
> Kevin Richardson, Chief Executive Officer, Precision Medicine, said, "We are delighted that the FDA has accepted this BLA ***as it moves us one step closer to bringing our breakthrough product to patients. We are aiming to revolutionize the management of kidney cancer,*** just as PSMA-PET/CT[7] scanning has changed the management of prostate cancer. By providing a more definitive clinical diagnosis for renal masses, we believe that Zircaix[2] will help physicians make more timely and confident patient management decisions and more quickly provide patients with a clear understanding of their disease and treatment options. Building further on Telix's successful urology franchise, ***we are preparing to bring this powerful precision medicine product to market in 2025***[8]."
>
> [1] Positron emission tomography.
> [2] Brand name subject to final regulatory approval.
> [3] Prescription Drug User Fee Act.
> [4] Zirconium in Renal Cancer Oncology, ClinicalTrials.gov ID: NCT03849118.
> [5] Telix ASX disclosures 7 November 2022.
> [6] Shuch et al. *Lancet Oncology.* 2024.

[7] Imaging of prostate-specific membrane antigen with positron emission tomography/computed tomography.
[8] Subject to regulatory approval.

104. Telix did not disclose the FDA-identified issues or employee-identified risks in its press release. The FDA's acceptance of the BLA had not "paved the way for a U.S. commercial launch in 2025" because, as Defendants knew, the BLA suffered from material deficiencies.

105. On the next day, Telix's co-founders would sell four million shares of Telix stock at a price double the value after the truth was disclosed.

### 5. The Second FDA Rejection of TLX250 (Kidney Agent)

106. On the last day of the Class Period August 28, 2025, Telix posted an announcement on its website informing investors that the FDA had once again rejected its BLA for TLX250 in the form of a Complete Response Letter. The press release was entitled "Telix Provides Regulatory Update on TLX250-CDx." It stated the following:

> Telix Pharmaceuticals Limited (ASX: TLX, NASDAQ: TLX, "Telix") today announces that it has received a Complete Response Letter (CRL) from the United States (U.S.) Food and Drug Administration (FDA) for the Biologics License Application (BLA) for ***TLX250-CDx (Zircaix®[1], $^{89}$Zr-DFO-girentuximab),*** an investigational PET[2] agent for the diagnosis and characterization of renal masses as clear cell renal cell carcinoma (ccRCC).
>
> ***The CRL identifies deficiencies relating to the Chemistry, Manufacturing, and Controls (CMC) package.*** The FDA has ***requested additional data to establish comparability between the drug product used in the ZIRCON Phase 3 clinical trial and the scaled-up manufacturing process intended for commercial use***. Additionally, the FDA has documented notices of deficiency (Form 483) ***issued to two third-party manufacturing and supply chain partners that will require remediation prior to resubmission***.
>
> [1] Brand name subject to final regulatory approval.
> [2] Position emission tomography.

107. On this news, the price of Telix ADSs fell $1.95 per ADS, or 16.1%, to close at $10.15 on August 28, 2025. The next day, Telix ADSs fell a further $0.60 per ADS, or 5.9%, to close at $9.55 on August 29, 2025.

108. The two third-party manufacturing and supply chain partners – whose identities were not publicly disclosed in the press release – were 3D Imaging Drug Design and Development ("3DI") and Goodwin Biotechnology Inc. ("GBI").

109. According to Telix, the FDA rejected the TLX250 BLA for two main reasons (i) comparability, and (ii) the deficiencies at its third-party manufacturers. The FDA's rejection of the TLX250 BLA was not a surprise to Defendants, however, as they had known during the Class Period about the very problems the FDA cited as the basis for its rejection. These were the very same issues which Telix VP and President of Global Drug Development Habi Soulaihi had presented to Defendant Behrenbruch, and which (as detailed *infra*) Telix had been dealing with for some time.

**6. Telix Knew it had a Comparability Problem Between the Trial Drug and Commercial Product, Highlighted by Particulates in the Solution**

110. The version of TLX250-CDx used in the clinical trials was not manufactured the same way as the version of TLX250-CDx that Telix planned to sell commercially. This change was made prior to submitting the first BLA in May 2024.

111. According to FE-1, when a drug company changes the manufacturing process for its commercial product from how it was made for use in the clinical trials, the FDA closely scrutinizes the comparability of the commercial product to the drug used in the clinical trials to ensure patients will receive the same product that was tested in trials.

112. Therefore, according to FE-1, making a manufacturing change between clinical and commercial use makes the Chemistry Manufacturing & Controls (or "CMC") part of BLA review more difficult.

113. Telix changed the way TLX250-CDx was manufactured when it was scaled up from production for clinical use to production for commercial use.

114. Consequently, the FDA wanted sufficient data from Telix to prove that the product made for commercial use was comparable to the product that was used in clinical trials.

115. According to FE-1, Telix began receiving significant Information Requests ("IRs") from the FDA indicating the agency's concerns about comparability issues in February 2025. The FDA's core focus of its questions and ongoing concerns was comparability issues that were eventually cited as a reason for the CRL.

116. FE-1 stated: "I think ***their initial concern that never went away*** was the original Phase 3 trial for Zircaix was executed with a certain product profile and a lot of changes were made to get the product ready for commercialization after that Phase 3 trial." "That's a tough one because the FDA wants comparability [data] to show what you're coming to market with…is essentially the same."

117. In this case, the need for data demonstrating comparability was particularly acute. According to FE-1, as part of its comparability review, the FDA had patient safety concerns about particulate matter that was found in the product manufactured for commercial use. The FDA asked Telix to do a number of tests to prove what the particulates were, what was causing them, and that they were fully filtered out of the solution at the point of injection in patients.

118. The issue of particulates in the solution was the same problem identified and presented to Defendant Behrenbruch prior to the resubmission in December 2024.

119. Telix attempted to assuage the FDA by explaining that the particulates were filtered out of the product at the clinics where the product was injected into patients for imaging scans. According to FE-1, Telix "tried to demonstrate with some studies that the filter [at the clinics] was removing [the particulates] and there was no risk to patients." The FDA was not satisfied with the studies Telix presented, particularly because the product to be sold commercially was manufactured differently than the one used in clinical trials.

120. Telix presented the FDA with analytical studies comparing the clinical and commercial version of TLX250, but the data was not conclusive enough for the FDA.

121. According to FE-1, in April or May 2025 the FDA told Telix to perform a statistically significant human trial to prove comparability. In May 2025, FE-1 told Telix Group Chief Operating Officer Darren Patti that Telix would have to do statistically significant human trials, as requested by the FDA. "I was trying to be very clear with them that we weren't going to get there [with the analytical comparison,] that we were going to need the clinical study." Patti conveyed this message to CEO Behrenbruch.

122. Though the FDA did not request the human study until April or May 2025, Telix realized all along that they could have to do such a statistically significant human study. Indeed, Telix had already begun a human study to prove comparability before the FDA requested it. But the study that Telix was conducting was too small (only 10 to 12 patients) to satisfy the FDA's requirement that the study be statistically significant. This posed a real problem for Telix. According to FE-1, a statistically significant study would require 80 patients and that would take a longer time and could not be completed before the August 2025 PDUFA date.

123. Defendant Behrenbruch was adamant that Telix not agree to the FDA's request to perform a statistically significant human study to prove comparability. According to FE-1, Telix

pushed back on the FDA's request. From the moment the FDA requested the statistically significant human study in April or May 2025, Behrenbruch was adamant that Telix not do one. Behrenbruch "was kind of trying to put his foot down on what he would allow the team to do – that somehow we'd be able to convince the FDA" that the larger trial wasn't necessary. Telix senior management simply refused to do the statistically significant human trial because it would be impossible to do so before the PDUFA date in August 2025.

124. Ultimately, in June 2025 Telix met with the FDA for the Late-Cycle Review Meeting, which FE-1 attended along with Defendant Behrenbruch. During this meeting, the FDA once again expressed its ongoing concerns about the comparability data, the patient safety issues related to the particulates, and deficiencies found during the pre-approval inspections of GBI and 3DI (all of which are detailed *infra*). It was clear that the FDA would not approve TLX250.

125. The Complete Response Letter for TLX250-CDx (the "TLX250 CRL") was not made publicly available until an edited and redacted version of it was published on the FDA's website on or about April 23, 2026, in response to Lead Counsel's FOIA request to the FDA. A copy of the TLX250 CRL is attached hereto as Exhibit B. The TLX250 CRL confirms the account of FE-1.

**7. Telix Knew of the Problems at GBI**

126. The FDA ultimately rejected the TLX250-CDx (Zircaix) (Kidgney Agent) BLA for several reasons, one of which was deficiencies found at third-party manufacturers. One of those third-party manufacturers was GBI.

127. Telix contracted with Goodwin Biotechnology Inc. ("GBI") in Plantation, Florida to manufacture the bioconjugator or "chelator" for TLX250-CDx, which worked to bind the isotope to the antibody.

128. According to FE-1, GBI had never been inspected or approved by the FDA to manufacture products for commercial use. Knowing that GBI had not ever passed a pre-approval inspection by the FDA, Telix hired a third party to conduct a mock FDA inspection at the facility.

129. According to FE-1, the mock inspection occurred at the end of 2024, and identified a number of deficiencies. Telix's mock-inspectors "discovered a pretty long list of concerns" and GBI only made a "wishy-washy commitment" to fix them.

130. FE-1 recalled that there was an email about the mock inspection results that was circulated internally at Telix, which Defendant Behrenbruch received and later referenced in a meeting attended by FE-1.

131. After the mock inspection and GBI's lackluster response, FE-1 and her team recommended to top Telix leadership, including Defendant Behrenbruch, that they find a back-up manufacturer. According to FE-1: "The feedback I got was, Chris said no, make it work with these guys."

132. GBI never satisfactorily addressed the issues discovered in the mock audit. "They weren't really working on the systematic issues," FE-1 said. "They were fixing things on the surface here and there." FE-1 said Telix was keeping track of GBI's efforts in early 2025 and was aware that the problems persisted, which is why FE-1 recommended finding another manufacturer as a back-up.

133. It wasn't just FE-1 voicing concerns. The head of quality and the rest of the quality department were also worried about GBI. The head of the quality department briefed Darren Patti, Group Chief Operating Officer, on a regular basis. Patti reported to CEO Behrenbruch on a weekly basis about the issues at GBI.

134. From May 13-16, 2025, the FDA conducted a pre-approval inspection at GBI in Plantation, FL, as part of the BLA for TLX250-CDx.

135. The FDA issued a Form 483 listing the deficiencies found during that inspection to GBI on May 16, 2025. A redacted copy of that Form 483, obtained via a FOIA request, is attached as Exhibit C.

136. Telix received the Form 483 from GBI shortly after it was issued. According to FE-1, the FDA findings in the Form 483 included multiple deficiencies identified by Telix in its mock inspection of GBI in 2024.

137. In June 2025 Telix met with the FDA for the Late-Cycle Review Meeting, which FE-1 attended along with Defendant Behrenbruch. During this meeting, the FDA indicated it could not approve TLX250 until, among other things, GBI passed a follow-up inspection to show it had corrected the deficiencies cited in the Form 483. According to FE-1: "The FDA was clear in the June meeting that successful inspections at the manufacturers were required for approval." It was also clear that there was not enough time for the re-inspection of GBI to occur before the August 2025 PDUFA date.

138. After the FDA issued the Form 483 to GBI, and GBI was given time to respond in writing, the FDA issued an Establishment Inspection Report (EIR) on October 16, 2025. The October 2025 EIR provides more details about the inspection and the deficiencies found. A redacted copy of the October 2025 EIR, obtained via a FOIA request, is attached as Exhibit D.

**8. Telix Knew of the Problems at 3DI**

139. The FDA ultimately rejected the TLX250-CDx (Zircaix) (Kidgney Agent) BLA for several reasons, one of which was deficiencies found at third-party manufacturers. One of those third-party manufacturers was 3DI.

140. Telix contracted with 3D Imaging Drug Design and Development ("3DI") to manufacture the radioisotope zirconium-89 that is used in TLX250-CDx.

141. According to FE-1, as described *supra* in Section IV.D.3., in late 2024 Telix employees created a list of top risks to FDA approval of TLX250 that was presented to Defendant Behrenbruch. One of the main risks identified was the quality of the zirconium provided by 3DI. That risk remained throughout the BLA review period because "the 3DI owner didn't want to do anything additional" to address Telix's quality concerns, according to FE-1. The risk "didn't get addressed. It remained a top risk that was always out there."

142. Telix did not disclose that it relied upon 3DI to obtain Zirconium for TLX250-CDx. Rather, Telix referenced different suppliers. On February 24, 2025, Telix filed its Form 20-F with the SEC, in which Telix indicated its "aim to continue to deepen our relationship with key manufacturing networks in the United States" for Zirconium, specifically naming Pharmalogic and Cardinal Health. This statement was false and misleading.

143. 3DI had previously been issued Form 483 citations by the FDA in 2019 and 2024.

144. From June 9-13, 2025, the FDA conducted a pre-approval inspection at 3DI in Little Rock Arkansas, as part of the BLA for TLX250-CDx.

145. The FDA issued a Form 483 listing the deficiencies found during that inspection to 3DI on June 13, 2025. A redacted copy of that Form 483, obtained via a FOIA request, is attached as Exhibit E.

146. According to FE-1, Telix learned of the FDA inspection of 3DI and Telix received a summary of the Form 483 shortly after the FDA closed the inspection in June 2025.

147. The Form 483 noted a number of deficiencies and found that the facility was not compliant with standards governing commercial manufacturing of radiopharmaceuticals.

148. According to FE-1, 3DI was "a small outfit run by one guy" and he was not willing to make all of the changes requested by the FDA to bring 3DI's manufacturing process into compliance. This was a serious problem for Telix's ability to obtain approval of TLX250-CDx.

149. In June 2025 Telix met with the FDA for the Late-Cycle Review Meeting, which FE-1 attended along with Defendant Behrenbruch. During this meeting, the FDA indicated it could not approve TLX250 until, among other things, 3DI passed a follow-up inspection to show it had corrected the deficiencies cited in the Form 483. According to FE-1: "The FDA was clear in the June meeting that successful inspections at the manufacturers were required for approval." It was also clear that there was not enough time for the re-inspection of 3DI to occur before the August 2025 PDUFA date.

150. Ultimately, 3DI did not address all of the FDA's concerns. After 3DI had an opportunity to respond to the FDA's Form 483 findings in writing, the FDA issued 3DI a Warning Letter in December 2025. Lead Counsel has requested that Warning Letter from the FDA but has not yet received a response.

151. Defendants made numerous false and misleading statements about TLX250-CDx (Zircaix) during the Class Period that omitted to disclose that Telix relied upon 3DI as a third-party manufacturer even though Defendants had substantial concerns about the quality of the zirconium from 3DI and knew about the FDA's findings of material deficiencies at 3DI. The FDA ultimately rejected the TLX250-CDx (Zircaix) BLA because of, among other things, the deficiencies at 3DI and this came as no surprise to Defendants.

### 9. Telix is Still Working to Address the FDA's Concerns

152. On February 20, 2026, Telix filed its annual Form 20-F for 2025 with the SEC (the "2025 Form 20-F") revealing that the Company has not yet been able to address the FDA's concerns from the prior TLX250 BLA submission. The 2025 Form 20-F stated:

> In December 2024 we resubmitted our BLA to the FDA for TLX250-Px, and the FDA accepted our application in February 2025. In August 2025, the FDA issued a Complete Response Letter ("CRL") citing deficiencies relating to the Chemistry, Manufacturing, and Controls ("CMC") package. The FDA requested additional data to establish comparability between the drug product used in the ZIRCON Phase 3 clinical trial and the scaled-up manufacturing process intended for commercial use. Additionally, the FDA documented notices of deficiency (Form 483) issued to two third-party manufacturing and supply chain partners that required remediation prior to resubmission. In December 2025 we participated in a Type A meeting with the FDA to align on plans to address CMC deficiencies cited, and in January 2026 we participated in an additional Type A meeting to align on plans to address comparability between the clinical drug product and that intended for commercial use. Following these meetings, Telix believes it has alignment with the Agency on key resubmission aspects, and is working both internally and with third-party vendors to implement these items for resubmission. ***While we believe that the planned remediation of the BLA for TLX250-Px will meet FDA requirements, there can be no assurance that, once resubmitted, the FDA will accept our BLA for review, or approve TLX250-Px.***

153. The fact that Telix still has not been able to fix the problems with the TLX250-CDx BLA – first submitted to the FDA in May 2024 and again in December 2024, illustrates the materiality and the seriousness of the problems with the BLA identified by Telix employees and brought to Defendant Behrenbruch's attention multiple times, but which he refused to disclose to investors even though he sold 2 million of his shares at the peak of the stock price.

### E. <u>The "Pump-and-Dump" Scheme</u>

154. Defendants made false and misleading statements enabling the Company's co-founders to sell four million shares of their personal holdings at artificially inflated prices far in excess of the Company's true value once the truth about Telix's pipeline of new drugs became known publicly.

155. On February 20, 2025, Telix's common stock on the Australian stock market closed at $26.46 (Australian) and Telix's ADSs traded in America closed at $17.41 (American). After the stock market closed, Telix issued a press release announcing its full year 2024 financial results and reporting on its "key achievements." Telix then held a conference call for investors and analysts to elaborate on these "key achievements." Telix also published its 2024 Annual Report on its website.

156. The market reaction to the press release, conference call, and 2024 Annual Report was overwhelmingly positive. On February 21, 2025, Telix common stock closed at $30.12 (Australian) and its ADSs closed at $19.50 (American). The next trading day was February 24, 2025, as markets were closed for the weekend, and Telix ADSs closed at $20.93. This was a significant increase in both the common shares and ADSs resulting from Defendants' statements.

157. The positive market reaction was for good reason. Defendants made numerous false and misleading but glowing statements about the Company's drug pipeline and manufacturing capabilities. As detailed further *infra* at Section V. Defendants' Misrepresentations, Telix's February 20, 2025 press release, conference call, and 2024 Annual Report each contained misleading statements highlighting the Company's (i) impending launch of TLX101 (Pixclara), (ii) Phase 3 trial of TLX591, and (iii) its new drug application for TLX250 (Zircaix).

158. For example, in the Company's 2024 Annual Report Defendant Behrenbruch wrote a letter to shareholders highlighting Telix's purported accomplishments in 2024, including that Telix's "new drug applications . . . have the potential to significantly impact the standard of care ***while super-charging Telix's cash generation capability***[.]" Behrenbruch concluded: "***Having built a strong foundation over the last few years, and with several major inflection points achieved in 2024, we are on the cusp of exponential growth***."

159. That purported "strong foundation" was an illusion. The "major inflection points achieved" were not as Defendants represented. Unbeknownst to investors, (i) Defendants already knew the FDA had found the clinical data submitted in Telix's new drug application for TLX101 (Pixclara) "did not provide substantial evidence of effectiveness" (*see* § IV.B.); (ii) the FDA had not approved a full Phase 3 trial of TLX591, but rather had only approved the first part of a Phase 3 trial and Defendants' statements to the contrary would lead to an ongoing formal SEC investigation (*see* § IV.C.); and (iii) Telix's Biologics License Application to the FDA for TLX250-CDx (Zircaix) suffered from multiple defects including that it relied upon third-party manufacturers Defendants knew did not conform with industry standards that, if discovered by the FDA, would result in (and did result in) the FDA rejecting the application (*see* § IV.D.).

160. Analysts didn't know the truth. They were impressed by Defendants' statements. For example, Auerbach Grayson issued an analyst report on February 20, 2025, raising its price target for Telix common shares 40% to $35 per share Australian. The reason for the price target increase was directly attributable to Defendants' false and misleading statements. The analyst wrote "'de-risking' the GOZELLIX, PIXCLARA, and ZIRCAIX components all contributed [to the increased price target]. ***All three products approach FDA approval with compelling clinical cases.***" With respect to the impact of TLX591 on the price target increase, the Auerbach Grayson analyst wrote: "Confirmation that US patient enrolment is happening helps firm up timelines for expected newsflow but more importantly runs counter to the anti-591 narratives that impact valuation from time to time."

161. A few days later, on February 23, 2025, Bell Potter issued an analyst report upgrading its rating on Telix to buy from hold and raising its price target to $36 per share from $21.60 per share Australian. The analyst report noted that Telix missed projected earnings but "the

market shrugged off the miss in favour of the glowing outlook for acquisition and organic revenue and earnings growth driven by a rapidly expanding program of therapeutic products to enter the clinic and ***imminent likely approvals for Pixclara, Gozellix and potentially Zircaix*** later in the year."

162. As detailed herein, both Pixclara and Zircaix would not launch in 2025 but be rejected by the FDA for reasons known to Defendants, and Defendants' characterizations of the ProstACT Global trial are under formal SEC investigation for being false and misleading.

163. On February 25, 2025, Telix issued another very positive press release to announce that it was "recruiting and dosing patients in the ProstACT Global Phase 3 trial[1] of TLX591 for patients with advanced prostate cancer, as part of a wider United States (U.S.) roll-out." (omitting footnote citing the trial protocol). This press release failed to properly disclose that the FDA had ***not*** approved a full Phase 3 trial of TLX591.

164. The February 25, 2025 press release was calculated merely to pump up the stock price. Telix had previously disclosed dosing had been ongoing at multiple U.S. sites. *See* 2024 Form 20-F at 106 ("We received authorization to conduct the trial in the United States in April 2024 and are actively dosing patients at multiple clinical trial sites.).

165. Then, on February 26, 2025, Telix issued two press releases. One announced the FDA had accepted Telix's application for TLX250-CDx (Zircaix). Though Defendants knew the application suffered substantial flaws that put FDA approval in serious jeopardy, Telix's press release praised TLX250-CDx (Zircaix) as fulfilling a "critical unmet need," a "breakthrough product," and characterized Telix as "preparing to bring this powerful precision medicine product to market in 2025." The FDA would ultimately reject the application for reasons known to Defendants at the time of the Company's February 26, 2025 press release.

166. Also on February 26, 2025, Telix issued a second press release informing investors that Telix's CEO ***would be*** selling two million shares of Telix stock.

167. On February 27, 2025, Telix issued a follow-up press release announcing that Defendant Behrenbruch and his co-founder Andras Kluge each sold two million Telix shares for $29.50 per share (in Australian dollars) for a total of $118 million Australian dollars. The private block sale was conducted at a discount to the closing price of $30.38 on the Australian stock exchange, as is customary for such large block sales. The closing price and sales price corresponded to approximately $18.85 to $18.95 and $18.30 to $18.40 American.

168. When the truth about Telix's leading pipeline drugs/diagnostics was revealed to investors, the Company's common stock price and ADSs collapsed. On August 29, 2025, the day after the Class Period ended, Telix common stock closed at $14.60 (Australian) and ADSs closed at only $9.55 (American). Neither the common stock nor ADSs price has recovered.

169. Had Telix's co-founders sold these four million shares after the market learned the truth about the Company's drug pipeline, they would have recognized approximately half the $118 million Australian dollars they received. The co-founders benefitted significantly from the Defendants' pump-and-dump scheme.

170. Defendant Behrenbruch and his co-founder Andreas Kluge's stock sales were unusual in size and timing, and inconsistent with their prior history of trading. A review of Telix's SEC filings and website indicates neither Behrenbruch nor Kluge sold a single Telix share or ADS in 2024 or 2025 other than the block sales on February 27, 2025. On information and belief, the last time either one had sold any shares was January 27, 2022.

171. Defendant Behrenbruch and his co-founder Andreas Kluge's stock sales were timed nearly to perfection, as is indicated in the chart of the common shares below.




172. Defendant Behrenbruch's sale of two million shares on February 27, 2025 violated Telix's Securities Dealing Policy, adopted by the Board of Directors effective December 12, 2024, and filed with the SEC as an exhibit to the Company's Form 20-F on February 24, 2025.

173. As set forth in Section V, Telix's February 26, 2025 press release falsely assured investors that Defendant Behrenbruch did not possess material inside information regarding Telix's FDA drug approvals at the time of his sales.

**F. <u>Defendant Behrenbruch's Stock Sales Triggered a Duty to Disclose</u>**

174. Defendant Behrenbruch sold Telix shares while in possession of material, non-public information concerning TLX591, TLX250 (Zircaix), and TLX101 (Pixclara), as detailed herein.

175. Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage. *Salman v. United States*, 137 S. Ct. 420, 423 (2016).

176. Under the traditional or classical theory of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the

basis of material, nonpublic information. Trading on such information qualifies as a deceptive device under § 10(b), because a relationship of trust and confidence exists between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation. *Chiarella v. United States*, 445 U. S. 222, 228 (1980). That relationship gives rise to ***a duty to disclose*** or to abstain from trading. *Id*. at 228-229. As detailed herein, on the date of his stock sales, Defendant Behrenbruch knew, but did not disclose despite having a duty to do so, that (i) Telix's TLX101 (Pixclara) drug application to the FDA "did not provide substantial evidence of effectiveness" (*see* §§ IV.B.); (ii) Telix had not obtained FDA approval for a full phase 3 trial of TLX591 (*see* §§ IV.C.); and (iii) that Telix's BLA for TLX250 (Zircaix) had multiple material deficiencies that would preclude FDA approval (*see* §§ IV.D.).

## V. DEFENDANTS' MISREPRESENTATIONS

177. On October 17, 2024, Telix filed a Form 20-F with the SEC signed by Defendant Behrenbruch. The Form 20-F contained numerous false and misleading statements about TLX591 (Prostate Drug), including:

> Our most advanced therapeutic candidate, TLX591 (177Lu-rosopatamab tetraxetan), is a lutetium-labelled radio antibody-drug conjugate, or rADC, ***which we are evaluating in a Phase 3 clinical trial in patients with advanced prostate cancer***. We dosed the first patient in this clinical trial in November 2023 in Australia. ***We received authorization to conduct the trial in the United States in April 2024*** and have opened clinical trial sites in the United States.

178. Defendants' statement about TLX591 were false and misleading as the FDA had not approved a full Phase 3 trial of TLX591, but only approved Part 1 of the ProstACT Global Phase 3 trial. *See* §IV.C.

179. Also on October 17, 2024, Telix issued a press release reporting on key achievements from the prior quarter. Defendant Behrenbruch was quoted as saying:

> Our achievements over the past quarter reinforce Telix's leadership in the radiopharmaceutical sector. We continue to make excellent progress across multiple late-stage assets in our therapeutic pipeline, ***while preparing to commercialise three new imaging agents within our precision medicine portfolio***.

180. The press release assured investors that Telix was on track to resubmit its BLA for TLX250-CDx in November 2024, without disclosing the material deficiencies in that BLA then known to Defendants:

> Kidney cancer imaging, TLX250-CDx (Zircaix®15, 89Zr-girentuximab): ***Telix is on track to resubmit*** the Biologics License Application (BLA) for its kidney cancer imaging agent in November 2024, consistent with prior guidance, and ***continues to target a full U.S. commercial launch in 2025***.

181. The press release also told investors that Telix had been cleared to begin a Phase 3 trial of TLX591, without revealing that the FDA had only authorized the first part of that trial. The press release stated: "***Following allowance*** of an Investigational New Drug (IND) application by the U.S. Food and Drug Administration (FDA) in April 2024***, the ProstACT GLOBAL Phase III trial*** is now enrolling patients at its first U.S. sites, in addition to ongoing patient dosing at sites in the Asia Pacific region."

182. Defendants' statements in the October 17, 2024 press release were false and misleading because: (i) Telix's BLA for TLX250-CDx (Zircaix) was plagued with serious deficiencies then known to Defendants, including the existence of particulates in the solution that did not exist in the version of the drug used in the clinical trials, such that asserting Telix would be able to commercialize TLX250-CDx in 2025, or that Telix was on track to file its BLA in November 2024, gave investors a false impression of the true state of development of TLX250, (*see* §IV.D.); and, (ii) Telix had not been "allowed" by the FDA to conduct a full Phase 3 trial of TLX591 in the ProstACT Global trial (*see* §IV.C.).

183. On December 30, 2024, Telix filed a press release announcing it had submitted its BLA for TLX250-CDx (Zircaix) (Kidney Agent) to the FDA. The press release quoted Kevin Richardson, Chief Executive Officer of Telix's Precision Medicine Unit as stating:

> We are pleased to be progressing the BLA for TLX250-CDx, which has been granted Breakthrough designation, and may therefore be eligible for priority review. Telix ***continues to target a full U.S. commercial launch in 2025*** addressing a major unmet medical need for patients with suspected ccRCC.

184. The Defendants' statements about Telix's Kidney Agent in the December 30, 2024 press release were false and misleading because Defendants omitted to disclose that (i) Telix knew prior to submission of material deficiencies in the BLA, *see* §§ IV.D.2.-4; (ii) Telix had altered the manufacturing process from the clinical trial to the commercial version of TLX250 (Zircaix), which Defendants knew would raise comparability concerns with the FDA, *see* § IV.D.6.; (iii) Telix relied on third-party manufacturers GBI and 3DI to make TLX250 (Zircaix), which had deficiencies known to Defendants that jeopardized FDA approval, *see* §§ IV.D.7. and IV.D.8; and (iv) the commercial version of TLX250 (Zircaix) contained visible particulates, further raising concerns about the manufacturing process and comparability, *see* §§ IV.D.3. and IV.D.6. Furthermore, the material deficiencies in the BLA for TLX250-CDx meant that Defendants could not reasonably believe Telix would make a commercial launch of TLX250-CDx in 2025, and it was materially misleading to assert such a launch date in light of the omitted material deficiencies in the BLA.

185. On February 20, 2025, after market close, Telix issued a press release, which misleadingly represented the status of the Company's drug pipeline without disclosing material facts known to Defendants. The press release stated:

> Telix continued to deliver on its growth strategy. The Company's key achievements, aligned to its strategic pillars:

> • Grow precision medicine: Prepared for launch of three new products TLX007-CDx (Gozellix®), TLX101-CDx (Pixclara®) and TLX250-CDx (Zircaix®)[4] in 2025 while continuing to increase sales and market share for Illuccix®.
>
> • Deliver late-stage therapeutics: Expanded ProstACT GLOBAL Phase 3 prostate cancer therapy trial recruitment in the U.S. and continued to advance therapeutic trials for the brain and kidney cancer programs.

[4] Launch and brand names subject to regulatory approval.

186. The press release quoted Defendant Behrenbruch:

"2024 has been an extraordinary year for Telix. We generated strong financial growth while investing for the future. ***The Precision Medicine business is poised for step-change growth with three commercial product launches planned for this year in the U.S.*** and the European rollout of Illuccix. We have a deep therapeutic pipeline with multiple assets moving into pivotal trials, ***and we are building out the infrastructure to ensure we can deliver our products to patients around the world***. We see 2025 as a year of significant growth and evolution for Telix in terms of international business, ***multiple product launches and the integration of key infrastructure that will further deliver on our mission to ensure global patient access***."

187. The February 20, 2025 press release was false and misleading because, as Defendants knew before February 20, 2025, (i) Telix's precision medicine unit faced material, undisclosed risks to being able to launch TLX250 (Zircaix) and TLX101 (Pixclara) in 2025, *see* §§ IV.B. and D.; (ii) Telix had not received FDA approval for the complete Phase 3 trial of TLX591, but only Part 1 of the Phase 3 trial, *see* § IV.C.; and (iii) Telix had not built out the infrastructure to ensure it could deliver TLX250 (Zircaix) safely to patients, but rather had relied on third-party manufacturers GBI and 3DI, that had known deficiencies that placed FDA approval of TLX250 (Zircaix) at grave risk, *see* §§ IV.D.7. and IV.D.8.

188. On February 20, 2025, after market close, Telix held its earnings call for the 2024 fiscal year. Defendant Behrenbruch participated in the conference call. During the February 20,

2025 conference call, an analyst asked about whether Telix anticipated any delays in its PDUFA dates for drugs being evaluated by the FDA. Defendant Behrenbruch and Telix's CEO of Precision Medicine Kevin Richardson responded that they anticipated no delays. Defendant Behrenbruch stated: "***We've already got clinical site inspections happening for Zircaix as well***." Richardson continued: "I would just add that, ***we continue to have good communications [with the FDA] as of today***. And as Chris [Behrenbruch] mentioned, our visits [to the manufacturers of TLX250 (Zircaix)] are scheduled and we're moving forward in the process. So that really hasn't changed."

189. Defendants' statements about "good communications" with the FDA and the scheduled inspections of the TLX250 (Zircaix) manufacturing facilities were false and misleading when made because, as Defendants knew before February 20, 2025, (i) Telix had altered the manufacturing process from the clinical trial to the commercial version of TLX250 (Zircaix), which Defendants knew raised comparability concerns and the FDA raised these concerns with Telix in February 2025, *see* §§ IV.D.3. and IV.D.6.; (ii) Telix relied on third-party manufacturers GBI and 3DI to make TLX250 (Zircaix), which had known deficiencies that jeopardized FDA approval, *see* §§ IV.D.3., IV.D.7. and IV.D.8.; and (iii) the commercial version of TLX250 (Zircaix) contained visible particulates, further raising concerns about safety, the manufacturing process, and comparability, *see* §§ IV.D.3. and IV.D.6.

190. During the February 20, 2025, conference call, Telix's CEO of Precision Medicine Kevin Richardson spoke in glowing terms of Telix's new imaging commercial portfolio of products:

> [G]lobal expansion of Telix's industry leading precision medicine portfolio is a key driver of our growth strategy. ***In the U.S. our commercial portfolio will continue to expand with the launches of our urology products Gozellix and Zircaix, followed by Pixclara*** for our neuro franchise.

* * *

> ***Zircaix is our first-in-class renal imaging agent*** designed to diagnose patients with ccRCC with undiagnosed renal masses. This is a new diagnostic area for PET imaging and Telix will leverage our success with the urologic physician and imaging centers who have growing confidence in PSMA imaging.
>
> Finally, ***our Pixclara agent will bring to neurology customers a technology that will quickly identify treatment related inflammation from tumor progression or pseudo progression and determine the best treatment pathway for the patient.***

* * *

> Turning towards 2025, we've already talked about the potential to launch three new products this year, which are subject to regulatory approval. Our launch planning is well underway. ***We built out the commercial infrastructure***, we trained our customer facing teams and we're currently delivering disease awareness education to the customer base through multiple channels.

* * *

> In the U.S., Zircaix has filed a BLA in December of 2024 and we are expecting a PDUFA date after the U.S. summer in 2025.With an expanded access program already in place across the U.S. and globally, physicians are already using our innovative kidney agent around the world on their patients and it is included in the EAU guidelines as an emerging technology.
>
> Moving to our neurology platform, Pixclara has an NDA with a PDUFA date of April 26, 2025, also with an ongoing expanded access program in the U.S. Our neurology franchise will target global regulatory filings based on market opportunities as we go –as we gain momentum around the globe.
>
> ***All the hard work our teams put in, in 2024 has set 2025 to be an exciting year as we transition to a multi-product multi-national commercial company, diversifying our revenue streams through multiple products across geographies***.

191. Telix's statements in the above paragraph from the February 20, 2025 conference call were false and misleading because, as Defendants knew before February 20, 2025, (i) both TLX250 (Zircaix) and TLX101 (Pixclara) faced material, undisclosed risks to FDA approval that meant they would not contribute to Telix's precision medicine portfolio being "a key driver of [Telix's] growth strategy" in 2025, *see* §§ IV.B. and IV.D.; (ii) Telix had ***not*** "built out the

commercial infrastructure" necessary to launch TLX250 (Zircaix), but rather had relied on third-party manufacturers GBI and 3DI which had known material deficiencies placing FDA approval of TLX250 (Zircaix) at grave risk, *see* §§ IV.D.7 and IV.D.8.; and (iii) Telix had ***not*** put in "the hard work" in 2024 necessary to make 2025 "an exciting year" to transition Telix into a "multi-product multi-national commercial company" through the approval of Zircaix and Pixclara, *see* §§ IV.B. and IV.D.

192. During the February 20, 2025, conference call, Telix's CEO of Therapeutics Richard Valeix stated:

> Moving to TLX591, our lead therapeutic candidate. It is a highly differentiated asset. It's an antibody versus the classical peptide PSMA available. It's a big opportunity.
>
> * * *
>
> ***As mentioned, this asset is now being studied in the ProstACT GLOBAL Phase 3 trial.*** ProstACT GLOBAL is the first trial to combine the synergistic effects of PSMA radioactive antibody drug conjugate with androgen receptor pathway inhibition and the well-known docetaxel. It is generating a lot of KOL interest. This study is rebooting well, including ramping up in the U.S. we are on track to deliver interim readout in H1. As a reminder, the interim readout will be focusing on the Part 1 of the study with the first 30 patients, which is looking at safety and dosimetry of TLX591 in combination with the standard of care administered in the study.

193. Telix's statement about TLX591 was false and misleading, as the FDA had not approved a full Phase 3 trial of TLX591, but only approved Part 1 of the ProstACT Global trial. *See* § IV.C.

194. During the February 20, 2025, conference call, Defendant Behrenbruch misrepresented Telix's manufacturing capacity, specifically as it applied to TLX250 (Zircaix). Telix relied on GBI and 3DI to manufacture TLX250 (Zircaix), which Defendants knew to suffer

from material deficiencies. Defendant Behrenbruch made the following statement on the conference call:

> To deliver these products globally, you need to have infrastructure to really be able to go that last mile and make the product available ***with a high degree of confidence for patients***.
>
> We've been focusing on building that infrastructure, scaling it to meet the demand both today and the expected demand for our products. And this is really a two-part model for success. We are heavily dependent on key partnerships. Our goal is not to go at the task of manufacturing alone. ***And in almost every market we operate in, we have key supply chain, manufacturing, distribution and even sales and marketing partnerships***. But we also have a certain amount of facilitative infrastructure ourselves.

195. Defendant Behrenbruch's statements about the Company having the ability to deliver product "with a high degree of confidence for patients" because it had "key supply chain, manufacturing [and] distribution" partnerships were false and misleading when made because, as Defendant Behrenbruch knew prior to February 20, 2025, Telix relied on 3DI and GBI to manufacture TLX250 (Zircaix), both of which suffered from deficiencies that would cause them to fail FDA inspections. Telix only had a couple of commercial products and TLX250 (Zircaix) was one of Telix's leading new drug applications, so Defendant Behrenbruch's statements would be understood by investors to pertain to TLX250 (Zircaix). *See* §§ IV.D.3., IV.D.7. and IV.D.8.

196. On February 20, 2025, Telix also published the Company's Annual Report for 2024 (the "2024 Annual Report"), which it posted to the Company's website and then filed with the SEC on February 21, 2024. The 2024 Annual Report began with "A message from the Chair" that stated:

> Our precision medicine business is expanding Illuccix® into global markets including Europe and the United Kingdom, and, subject to regulatory approval, ***has planned commercial launches of our new prostate cancer imaging agent TLX007-CDx (Gozellix®[3]), our kidney cancer imaging agent TLX250-CDx***

> ***(Zircaix®3), and TLX101-CDx (Pixclara®3) our imaging agent for cancerous brain lesions***.
>
> We are progressing our therapeutic pipeline, ***through the Phase 3 ProstACT GLOBAL[4] trial of TLX591***, a therapeutic agent for prostate cancer. This trial has been expanded in 2024 to include U.S. sites. ***An interim read-out of Part 1 is expected in H1 2025***.
>
> 3. Brand name subject to final regulatory approval.
> 4. ClinicalTrials.gov ID: NCT06520345.

197. The above statements in the 2024 Annual Report were false and misleading as (i) commercial launches were not going to happen because both TLX250 (Zircaix) and TLX101 (Pixclara) suffered from known, undisclosed material defects that would foreclose FDA approval, *see* §§ IV.B. and IV.D.; and (ii) the FDA had not approved a full Phase 3 trial of TLX591, but only approved Part 1 of the ProstACT Global trial, *see* § IV.C.

198. The 2024 Annual Report included a letter from Defendant Behrenbruch in which he claimed that Telix's three new drug applications – including TLX250 (Zircaix) and TLX101 (Pixclara) – demonstrated that the Company's new strategy was a success:

> Our Strategy
>
> We have a clear strategy in place to leverage the near-term clinical and commercial opportunities within our Px (imaging) business, while continuing to develop the therapies that will define our future clinical and shareholder value creation. Our Px and Tx businesses share a common investment in the infrastructure we are building, both through direct investments in supply chain and manufacturing capabilities, as well as strategic partnerships in key markets.
>
> ***2024 has therefore been a transformative year, in which we have laid the strategic foundation for the next phase of growth***. Our strategy is simple: deliver, grow, build and expand.
>
> * * *
>
> ***This strategy is evident in our execution. We filed three new drug applications for Px products that have the potential to significantly impact the standard of care while super-charging Telix's cash generation capability. We advanced our***

> ***highly-differentiated Tx radiopharmaceutical pipeline, which, we believe, is the deepest in the industry***. This included the acquisition of new targets and modalities with the potential to considerably broaden our future clinical impact. Our clinical and regulatory activities are driving geographic expansion across multiple markets with the goal of being commercially active in over 30 countries by the end of 2025. ***Finally, our investments in supply chain, manufacturing and distribution capabilities are designed to ensure Telix and select partners achieve best-in-class delivery performance and reliability to patients – wherever we operate.***
>
> Investing for growth
>
> By the end of 2025, we expect Telix to look like a different company yet again. Our metamorphosis is well underway, as we become a globally active, multi-product company, ***with the infrastructure in place to scale for future demand***.
>
> * * *
>
> Conclusion
>
> ***Having built a strong foundation over the last few years, and with several major inflection points achieved in 2024, we are on the cusp of exponential growth***.

199. The above statements in the 2024 Annual Report were false and misleading as (i) Telix had not "laid the strategic foundation for the next phase of growth" and Telix's "three new drug applications" were not evidence of the Company's execution, as two of these new drug applications – TLX250 (Zircaix) and TLX101 (Pixclara) – contained serious material deficiencies, *see* §§ IV.B. and IV.D.; and (ii) Telix had not made "investments in supply chain, manufacturing and distribution capabilities" sufficient to "ensure Telix and select partners achieve best-in-class delivery performance and reliability to patients" as Telix had in fact relied upon 3DI and GBI to manufacture TLX250 (Zircaix), and both suffered from material undisclosed deficiencies, *see* §§ IV.D.3., IV.D.7 and IV.D.8.

200. The 2024 Annual Report further falsely assured investors that Telix believed it would launch TLX250 in 2025, without disclosing the known deficiencies in the BLA Telix submitted to the FDA. It stated:

> TLX250-CDx (Zircaix[2], $^{89}Zr$- girentuximab) is a PET diagnostic imaging agent for the characterization of renal masses as ccRCC. Telix completed its U.S. BLA for TLX250-CDx PET imaging of ccRCC in December 2024. We continue to target a U.S. commercial launch in H2 2025, pending acceptance of the BLA for filing, and regulatory approval.
>
> 2. Brand name subject to final regulatory approval.

201. The 2024 Annual Report also included disclosures on known risks, and false and misleading "Key mitigation strategies and tactics" to deal with these known risks. For instance, the 2024 Annual Report indicated "Supply chain resilience and responsibility" as a known risk and falsely stated the Company had taken significant precautions to address this risk, when in fact Telix knew its TLX250 (Zircaix) third-party suppliers were materially deficient and would not pass an FDA inspection:

> Telix ***has dual supply surety*** where possible and continues to seek viable and sustainable opportunities for end-to-end supply chain integration within the Group structure - for example, through the acquisition and development of in-house manufacturing capability at its TMS facilities, reducing exposure to third-party risk. ***Supplier risk programs are critical elements of Telix's risk mitigation tactics in this area and we aim to continuously improve our vendor selection, diligence and vendor management strategy and framework to manage supply chain resilience and related risk***.

202. The 2024 Annual Report similarly reassured investors that Telix validated the manufacturing processes used to produce its products to ensure product quality, even though Telix knew its third-party manufacturers of TLX250 (Zircaix) were deficient. The 2024 Annual Report stated:

> Telix is committed to delivering high quality innovative medicines to patients and conducting our clinical trials with a philosophy and in a manner that recognizes the importance of patient safety and respecting the rights of participants.
>
> * * *
>
> Telix has a Quality Management System (QMS) in place based on the international ISO 9001 series of Quality Management standards that is consistently

> implemented, and risk-based to maintain quality product for clinical and commercial distribution.
>
> * * *
>
> Telix products are researched, manufactured and tested at certified Good Laboratory Practice (GLP), Good Distribution Practice (GDP) and Good Manufacturing Practice (GMP) facilities, ***and processes, methods and change control are validated***.

203. Defendants' above statements from the 2024 Annual Report were false and misleading when made because Telix had in fact relied upon 3DI and GBI to manufacture TLX250 (Zircaix), and both suffered from material undisclosed deficiencies known to Defendants. *See* §§ IV.D.3., IV.D.7., and IV.D.8.

204. The 2024 Annual Report also falsely assured investors that Defendants anticipated that TLX101-CDx would be approved and be sold commercially in 2025. It stated:

> The FDA accepted the NDA and granted priority review for Pixclara on 24 October 2024. With priority review status and PDUFA goal date of 26 April 2025, ***a commercial launch is anticipated in 2025.***

205. Defendants' above statement from the 2024 Annual Report was false and misleading when made because Telix had already been notified by the FDA of significant deficiencies in its TLX101 NDA and therefore knew there was not a reasonable basis to believe it would launch in 2025. *See* § IV.B.

206. On February 24, 2025, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2024 (the "2024 Form 20-F"). Attached to the 2024 Form 20-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Behrenbruch attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

207. The 2024 Form 20-F falsely stated the Company had authority to go forward with a Phase 3 trial of TLX591:

> We have not submitted any applications for regulatory approval or obtained regulatory approval for any of our therapeutic product candidates. Our most advanced therapeutic candidate, TLX591 ($^{177}$Lu-rosopatamab tetraxetan), is a lutetium-labeled radio antibody-drug conjugate, or rADC, ***which we are evaluating in a Phase 3 clinical trial in patients with advanced prostate cancer.*** We dosed the first patient in this clinical trial in November 2023 in Australia. ***We received authorization to conduct the trial in the United States in April 2024 and are actively dosing patients at multiple clinical trial sites.*** We cannot be certain that TLX591, or any of our clinical trials of our other therapeutic product candidates, will generate safety and efficacy data sufficient for regulatory approval in any jurisdiction.

208. Similarly, the 2024 Form 20-F stated:

> In 2024, we expanded the dosing of patients in the Phase 3 ProstACT GLOBAL study from the Asia Pacific region to the U.S. This is a study of TLX591 ($^{177}$Lu-rosopatamab tetraxetan), our lead radio antibody-drug conjugate therapy candidate for advanced prostate cancer. This [is a] ***multinational Phase 3 study*** to investigate and confirm the benefits and risks associated with TLX591, when administered together with standard of care, or SoC, and compared to SoC alone.

209. The 2024 Form 20-F also stated that Telix would proceed to the second portion of the Phase 3 ProstACT Global trial of TLX591 after finishing the first part, without any reference to the required FDA approval to do so.

> We are also investigating TLX591 in the Phase 3 ProstACT GLOBAL clinical trial. We expect this trial to enroll 30 patients in a dosimetry and safety lead-in portion in replicating the prior study using the product candidate specifications intended for commercial release ***and then proceed to a randomized treatment expansion portion, in up to approximately 490 patients***. The trial is a multi-national, multi-center, prospective, randomized, controlled, open label study designed to investigate and confirm the benefits and risks associated with TLX591 a high-affinity PSMA-targeted rADC that delivers DNA breaking radiation directly to PSMA-positive bone, nodal, or visceral metastases in patients with mCRPC. The trial will enroll patients that have PSMA-positive mCRPC who have experienced disease progression following treatment with an androgen receptor pathway inhibitor (abiraterone or enzalutamide) that was received in either the metastatic castration-sensitive prostate cancer or first-line mCRPC treatment setting. The primary endpoint of the randomized portion of the trial is radiographic progression-

free survival and secondary endpoints include overall survival, objective response rate, time to first symptomatic skeletal events, PFS, PSA decline of more than 50%, quality of life and safety and tolerability.

210. Similarly, the 2024 Form 20-F stated:

In November 2023, we initiated a randomized, multinational, multicenter, open-label Phase 3 trial, which we refer to as the ProstACT GLOBAL trial, to evaluate TLX591 for the treatment of PSMA-positive mCRPC patients in combination with the standard of care compared to the standard of care alone. We expect this trial to enroll 30 patients in a dosimetry and safety lead-in portion replicating the prior study using the product candidate specifications intended for commercial ***release and then proceed to a randomized treatment expansion portion, in up to approximately 490 patients***.

211. The 2024 Form 20-F also falsely stated that Telix had been given approval to conduct efficacy testing in the PROSTACT clinical trials, when the Company had only been granted FDA approval for Part 1 of the study testing safety. The 2024 Form 20-F stated: "We are evaluating the safety and efficacy of TLX591 in the ProstACT series of clinical trials."

212. Defendants' statements in the 2024 Form 20-F concerning TLX591 were false and misleading because the FDA had not authorized Telix to conduct a full Phase 3 trial, but only approved Part 1 of the trial. Telix could not automatically "proceed to a randomized treatment expansion portion" of the trial. As set forth in Section IV.C.5., Telix's 2025 Form 20-F corrected the misleading statements in the 2024 Form 20-F after the SEC opened a formal investigation of Telix and subpoenaed the Company.

213. The 2024 Form 20-F included the following false and misleading risk disclosure.

Additionally, as we expect the market for Illuccix and PSMA-PET imaging to expand and our product candidates progress through preclinical studies and clinical trials towards potential approval and commercialization, ***it is possible that various aspects of manufacturing will be altered in an effort to optimize processes and results. Such changes may require new submissions to and approval from regulators, which may further delay the timeframes under which modified manufacturing processes can be used for Illuccix or any of our product candidates***, and additional bridging studies or trials may be required. Any such

> delay could harm our business, financial condition, results of operations and prospects.

214. This statement of a purported, future hypothetical risk was false and misleading at the time it was made because Telix had in fact, as Defendants knew, already altered the manufacturing process for the commercial version of TLX250-CDx versus the version used in the clinical study. As detailed in Sections IV.D.3. and IV.D.6. *supra*, according to FE-1 the changed manufacturing process caused the FDA to more closely scrutinize the comparability of the clinical and commercial version of TLX250, which Telix knew would be of significant concern to the FDA particularly in light of the particulate matter in the solution and which ultimately led to the FDA rejecting TLX250. Telix did not disclose this actual risk that had occurred, rather than the hypothetical risk disclosure that it was "possible."

215. The 2024 Form 20-F included the following risk disclosures regarding the Company's reliance upon third-party manufacturers to comply with "Current Good Manufacturing Practices" or cGMPs:

> We, our contract manufacturers, any future collaborators and their contract manufacturers could be subject to periodic unannounced inspections by the FDA or other comparable foreign regulatory authorities, to monitor and ensure compliance with cGMPs or similar foreign requirements. ***Despite our efforts to audit and verify regulatory compliance, we or one or more of our third-party manufacturing vendors may be found on regulatory inspection by the FDA or other comparable foreign regulatory authorities to be noncompliant with cGMPs or similar foreign regulations.*** This may result in shutdown of our facility or that of the third-party vendor or invalidation of product lots or processes, which could adversely affect our business, financial condition, results of operations and prospects. In some cases, a product recall may be warranted or required, which would materially affect our ability to supply and market our products and could be costly and result in reputational damage.

216. This statement of a purported, future hypothetical risk was false and misleading at the time it was made because Telix had in fact, as Defendants knew, already conducted an audit

and inspection of GBI, one of the third-party manufacturers of TLX250-CDx and discovered that GBI had material deficiencies that needed to be fixed. Telix submitted the TLX250-CDx BLA anyway. As detailed in Section IV.D.7. *supra*, according to FE-1 GBI failed the audit in late-2024 and had not addressed the problems identified, which Telix knew would be of significant concern to the FDA and which ultimately led to the FDA rejecting TLX250. Telix did not disclose GBI suffered from ***known*** deficiencies, but merely that the FDA ***could*** find noncompliance.

217. The 2024 Form 20-F included the following risk disclosures regarding the Company's reliance upon third-party manufacturers to comply with FDA requirements:

> Third-party manufacturers may not be able to comply with cGMPs or similar regulatory requirements outside of the United States. ***<u>If</u> our manufacturers cannot successfully manufacture material that conforms to our specifications and the strict regulatory requirements of the FDA and any applicable foreign regulatory authority, they will not be able to secure and/or maintain regulatory approval for their manufacturing facilities***. If these facilities are not approved for commercial manufacture or are not able to maintain approval, we may need to find alternative manufacturing facilities, which could significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates as alternative qualified manufacturing facilities may not be available on a timely or cost-efficient basis, or at all.

218. This statement of a purported, future hypothetical risk was false and misleading at the time it was made because Defendants already knew both 3DI and GBI did ***not*** conform to the strict regulatory requirements of the FDA, as detailed in Sections IV.D.3., IV.D.7., and IV.D.8. *supra*.

219. The 2024 Form 20-F misleadingly assured investors that Telix resubmitted its BLA for TLX250 after addressing the concerns raised by the FDA in the first application:

> We submitted a BLA for TLX250-CDx to the FDA for regulatory approval in December 2023 for characterization of masses as ccRCC. The BLA was granted on a rolling review process. We completed the BLA submission in May 2024, and in July 2024, the FDA declined to review the BLA and issued an RTF determination. The denial of acceptance for filing was based on a filing concern related to

> demonstrating adequate sterility assurance during dispensing of TLX250-CDx in the radiopharmacy production environment. ***We resubmitted the BLA to the FDA in December 2024. While we believe that TLX250-CDx has met all sterility requirements of product release and that we have completed the required remedial actions***, there can be no assurance that FDA will accept the BLA for review or that we will obtain regulatory approval from the FDA. If approved, TLX250-CDx would be the first targeted radiopharmaceutical imaging agent for kidney cancer to be approved in the United States.

220. Defendants' statements in the 2024 Form 20-F concerning TLX250-CDx were false and misleading because, among other things, Telix had failed to address remedial actions the FDA suggested when the FDA declined to review the first BLA submission for TLX250-CDx. *See* § IV.D.2. In this context, after Telix had already engaged in dialogue with the FDA on the first submission, the statement "***we have completed the required remedial actions***" misled investors by suggesting Telix had addressed all of the FDA's concerns. Telix had not, and Defendants were aware of other material concerns that would cause the FDA to reject the application. *See* § IV.D.3.

221. The Telix 2024 Form 20-F also misleadingly stated "we intend to broaden our commercial footprint in precision medicine by . . . obtaining approval for TLX101-CDx for the imaging of glioma. The application has been granted priority review and designated a PDUFA goal date of April 26, 2025, ***paving the way for a U.S. commercial launch in 2025***."

222. Defendants' statement regarding the commercial launch of TLX101-CDx was misleading. As set forth in § IV.B., Defendants knew the FDA had found significant deficiencies in the NDA for TLX101-CDx (Pixclara). There was no legitimate basis to assert the April 26, 2025 PDUFA date "paved the way" for a U.S. launch in 2025.

223. The Telix 2024 Form 20-F also misleadingly described the trial data for TLX101-CDx:

> Clinical Programs and Data – TLX101-CDx
>
> In August 2024, we submitted an NDA to the FDA for regulatory approval of TLX101-CDx as a radioactive diagnostic agent indicated for use with PET imaging for the characterization of progressive or recurrent glioma from treatment related changes in both adult and pediatric patients through the 505(b)(2) NDA regulatory pathway.
>
> The ability of TLX101-CDx trials to differentiate between various tumor subtypes and disease stages has been evaluated in 725 glioma patients across 14 comparative trials. Trial designs were both prospective and retrospective. Using various imaging technique specifications, studies compared TLX101-CDx with magnetic resonance imaging, [and other methods commonly used]. ***These trials provided evidence that TLX101-CDx tended to result in higher sensitivity and specificity***.
>
> TLX101-CDx was also the subject of a published systemic review and meta-analysis covering 26 studies with a total of 1206 patient/lesions, ***that conclude that TLX101-CDx showed promise as a complementary modality to standard-of-care MRI for the management of brain malignancies.***

224. Defendants' statements regarding the trial data supporting TLX101-CDx were misleading. As set forth in § IV.B., Defendants knew the FDA had found the trial data in the NDA for TLX101-CDx (Pixclara) "did not provide substantial evidence of effectiveness" and it was therefore misleading to tell investors otherwise.

225. The Telix 2024 Form 20-F also misleadingly stated: "With respect to producing radiolabeled drug product, we aim to continue to deepen our relationship with key manufacturing networks in the United States: Pharmalogic for [Zirconium] products [and] Cardinal Health for [Zirconium] products. . . ."

226. This statement was false and misleading. Telix did not disclose that it relied upon 3DI for zirconium for TLX250-CDx (Zircaix) (Kidney Agent).

227. On February 25, 2025, Telix issued a press release titled "Recruitment Spotlight: Phase 3 Clinical Trial of Novel Prostate Cancer Radiopharmaceutical Now Active in Miami." The press release stated:

> Telix Pharmaceuticals Limited (ASX: TLX, Nasdaq: TLX, Telix, the Company) announces that the Biogenix Molecular Research Center in Miami, FL, ***is recruiting and dosing patients in the ProstACT Global Phase 3 trial[1] of TLX591 for patients with advanced prostate cancer, as part of a wider United States (U.S.) roll-out***.
>
> ProstACT Global is trialling a promising new treatment option for prostate cancer, which is the most commonly diagnosed cancer and the second leading cause of cancer-related death for U.S. men. This month, Biogenix Molecular Research Center successfully administered two doses of TLX591, 14 days apart, to a local Miami-based patient, and continues to recruit eligible patients in the Miami area.
>
> [1] ClinicalTrials.gov ID: NCT06520345.

228. The press release further stated:

> The ProstACT Global trial design consists of an international, multicenter trial in two parts: Part 1, safety and dosimetry run-in with 30 patients; and Part 2, 2:1 randomized global expansion with an overall target enrolment of approximately 490 patients. Eligible patients must have confirmed progressive mCRPC assessed with a $^{68}$Ga-PSMA-11 PET[6] imaging agent (such as Illuccix®) following prior treatment with an ARPI.
>
> [6] Positron emission tomography.

229. The February 25, 2025 press release was false and misleading because the FDA had not approved a full Phase 3 trial of TLX591, but only approved Part 1 of the ProstACT Global trial. *See* § IV.C. Furthermore, it was misleading for Telix to tout the dosing of patients in Miami when dosing had already been ongoing for months, but Telix issued the press release precisely to support the stock price knowing its CEO would sell a massive block of shares only two days later. *See* § IV.E.

230. On February 26, 2025, Telix issued a press release announcing the FDA had accepted its BLA for TLX250. The press release was effusive in its praise for TLX250. It stated:

> Telix today announces that the United States (U.S.) Food and Drug Administration (FDA) has accepted the Biologics License Application (BLA) for its breakthrough investigational kidney cancer PET[1] imaging agent TLX250-CDx (Zircaix®[2], $^{89}$Zr-

DFO-girentuximab), granted a Priority Review and provided a PDUFA[3] date of 27 August 2025, paving the way for a U.S. commercial launch in 2025.

If approved, TLX250-CDx will become the first commercially available imaging agent to accurately and non-invasively diagnose and characterize clear cell renal cell carcinoma (ccRCC), the most common and one of the most aggressive sub-types of kidney cancer. It works by specifically binding to carbonic anhydrase IX (CAIX), a validated target protein expressed on 95% of ccRCC cells to produce images with high tumor-to-background ratio and high intra- and inter-reader consistency.

The BLA is based on Telix's successful global Phase 3 ZIRCON[4] study, which demonstrated a sensitivity of 86%, specificity of 87% and a positive predictive value (PPV) of 93% for ccRCC, including in very small, difficult-to-detect lesions[5]. The results of this study were published in The Lancet Oncology in September 2024, in a peer-reviewed manuscript by Professor Brian Shuch (University of California, Los Angeles, UCLA) and colleagues[6]. The paper outlines the critical unmet need for a new, non-invasive technique that can accurately detect and differentiate ccRCC from other renal masses in patients and concluded that TLX250-CDx meets this need and 'has the potential to be practice changing.'

Kevin Richardson, Chief Executive Officer, Precision Medicine, said, "We are delighted that the FDA has accepted this BLA as it moves us one step closer to bringing our breakthrough product to patients. We are aiming to revolutionize the management of kidney cancer, just as PSMA-PET/CT[7] scanning has changed the management of prostate cancer. By providing a more definitive clinical diagnosis for renal masses, we believe that Zircaix[2] will help physicians make more timely and confident patient management decisions and more quickly provide patients with a clear understanding of their disease and treatment options. ***Building further on Telix's successful urology franchise, we are preparing to bring this powerful precision medicine product to market in 2025***[8]."

[1] Positron emission tomography.
[2] Brand name subject to final regulatory approval.
[3] Prescription Drug User Fee Act.
[4] Zirconium in Renal Cancer Oncology, ClinicalTrials.gov ID: NCT03849118.
[5] Telix ASX disclosures 7 November 2022.
[6] Shuch et al. *Lancet Oncology.* 2024.
[7] Imaging of prostate-specific membrane antigen with positron emission tomography/computed tomography.
[8] Subject to regulatory approval.

231. The February 26, 2025 press release was false and misleading because, as detailed in Section IV.D., it failed to disclose that Defendants already knew the BLA for TLX250-CDx

(Zircaix) suffered from numerous material deficiencies that were likely to be discovered by the FDA and lead to the BLA being denied, but Defendants had submitted the BLA anyway to prop up the Company's stock price so CEO Behrenbruch could sell shares at artificially inflated prices.

232. On February 26, 2025, Telix issued a press release notifying investors that Defendant Behrenbruch would be selling two million shares of Telix stock, and that the "Board of Directors has approved the sale[.]"

233. The February 26, 2025 press release was false and misleading in that Defendant Behrenbruch was then in possession of material non-public information regarding Telix, and any sale of Telix shares by him would be a violation of American and Australian securities laws, as well as Telix's Securities Dealing Policy adopted by the Board of Directors effective December 12, 2024. Telix's Securities Dealing Policy states that "an Employee [ ] who possesses Inside Information in relation to Telix Securities . . . ***must not***: apply for, acquire or dispose of those securities, or agree to do so . . . ." The Telix Securities Dealing Policy states: "Inside Information may include matters of supposition, matters that are not yet certain and matters relating to a person's intentions" and would include "undisclosed material operational or regulatory developments" and "likely receipt or grant (or decline) of a market authorization approval by a regulatory agency[.]" Defendant Behrenbruch was in possession of such information.

234. Furthermore, the February 26, 2025 press release was also false and misleading in that it asserted the Telix Board of Directors had approved Defendant Behrenbruch's sales, even though such sales clearly failed the "Front Page Test." The Telix Securities Dealing Policy states: "Where any approval is required for a dealing under this Policy, approval will not be granted where the dealing would not satisfy the Front Page Test." The Front Page Test, as set forth in Telix's Securities Dealing Policy, states that Employees should ask themselves: "If the market was aware

of all the current circumstances, could I be perceived to be taking advantage of my position in an inappropriate way? How would it look if the transaction were reported on the front page of the newspaper?" Here, Behrenbruch sold two million shares while knowing material inside information concerning the drug applications for TLX591, TLX250-CDx, and TLX101-CDx, all of which negatively impacted the Company's stock price. Behrenbruch violated the Securities Dealing Policy, and approval by the Board of Directors was either obtained through subterfuge or willing disregard for the truth. The Company's press release painted the false impression that Behrenbruch had no material negative information about the Company's drug applications and thus enabled Behrenbruch to sell shares at an artificially inflated stock price.

235. On April 22, 2025, after market close, Telix issued a press release, which misleadingly represented the status of the Company's drug pipeline without disclosing the material facts known to Defendants. The press release stated:

> ProstACT™ Global, the Phase 3 trial of TLX591 ($^{177}$Lu-rosopatamab tetraxetan), Telix's prostate cancer therapy candidate, continues to recruit and remains on track to deliver a Part 1 readout (safety and dosimetry) in H1 2025.
>
> * * *
>
> The FDA accepted the Biologics License Application (BLA) for Telix's kidney cancer imaging candidate TLX250-CDx (Zircaix®[15], $^{89}$Zr-DFO-girentuximab), granted a Priority Review, and provided a PDUFA[16] goal date of 27 August 2025.
>
> The NDA for TLX101-CDx (Pixclara®[15], $^{18}$F-floretyrosine or $^{18}$F-FET), Telix's brain cancer imaging candidate, continues to progress with a PDUFA goal date of 26 April 2025.
>
> [15] Brand name subject to final regulatory approval.
> [16] Prescription Drug User Fee Act.

236. These statements were materially false and misleading at the time they were made for the reasons stated in Section IV. In particular, by April 22, 2025, Defendants already had been

updated by the FDA as to the significant deficiencies in the application for TLX101-CDx (Pixclara). *See* §IV.B. Indeed, the FDA would deny the application only three days later on April 25, 2025; the rejection was not a surprise. *Id.*

237. After the market closed on August 20, 2025, Telix issued a press release reporting its first half of 2025 financials. The press release included the following statement from Defendant Behrenbruch:

> Telix continues to deliver strong revenue growth while building a foundation for the future. The first half of 2025 was a period of rapid transformation as we expanded our global manufacturing operations, invested in launching new products in new markets, and accelerated the development of our therapeutic pipeline. These investments have positioned Telix for sustainable, long-term growth, while our diversified business provides multiple drivers of success. ***To generate future revenue growth, we are confident in securing product approvals for Pixclara and Zircaix while advancing geographic and indication expansion for the PSMA portfolio***.

238. After the market close on August 20, 2025, Telix conducted its earnings call for the first half of 2025 (the "1H Call"). Defendants misleadingly told investors that the Company's sales force was ready to sell Zircaix and that the Company was "excited about the launch" of Zircaix because the "market is ready for this product[,]" when in fact Defendants knew in August 2025 that the FDA would reject the Zircaix BLA.

> [Analyst] Xiaochuan Dai
>
> Congrats on the quarter. I'm just curious about the Zircaix launch readiness. Maybe you can highlight some of the things you've been doing for Zircaix and how should we think about the launch in the first and the second quarter after approval on August 27?
>
> [Defendant] Christian P. Behrenbruch
>
> There's probably not too much to really kind of openly discuss. I mean the commercial team, it's not their first rodeo. We're selling into the same customer base, same referral physician base as Illuccix. So it's a very straightforward pathway to the customer. We're clearly focused on using our Illuccix customer base

> to seed that product launch. ***And I would say commercial team is ready to rock and roll on Zircaix***. I don't know if you want to add anything to that, Kev?
>
> [Telix CEO Precision Medicine] Kevin Richardson
>
> No, I think the combination of a urological call point with a nuclear med physician base that's reading that is really the key to success there. And we've had an expanded access program going for a while that's demonstrated exactly what we saw in the ZIRCON study. ***So we're excited about the launch*** and just haven't given guidance for 2026 yet.
>
> [Defendant] Christian P. Behrenbruch
>
> Yes. I mean we've had a lot -- the expanded access program, the EAP has been a huge success. We've done a very, I think, well-orchestrated unbranded physician education campaign. ***So as far as we're concerned, the market is ready for this product.***

239. As detailed in Section IV.D., Defendants' August 20, 2025 press release and statements concerning bringing TLX250 (Zircaix) to market were false and misleading. Defendants, including Behrenbruch, could not possibly be "confident in securing product approval[ ] for [ ] Zircaix" or "excited about the launch," and any such statements were misleading in light of the material facts known to Defendants at that time, but undisclosed to investors. As detailed in Sections IV.D.6., IV.D.7., and IV.D.8., Telix met with the FDA for the Late-Cycle Review Meeting in June 2025, which FE-1 attended along with Defendant Behrenbruch. During this meeting, the FDA indicated it could not approve TLX250 until, among other things, GBI and 3DI passed follow-up inspections to show they had corrected the deficiencies cited in the Form 483 reports. According to FE-1: "The FDA was clear in the June meeting that successful inspections at the manufacturers were required for approval." It was also clear that there was not enough time for the re-inspection of 3DI to occur before the August 2025 PDUFA date. Further, the FDA wanted Telix to run a statistically significant human study to demonstrate comparability, which Telix could not do before the PDUFA date.

240. Also on the August 20, 2025 conference call, Telix's Chief Financial Officer Darren Smith made the following statement regarding the Company's manufacturing and supply chain, which was vital to Telix's ability to deliver highly sensitive radioactive medicines and diagnostic products:

> We continue to ***invest strategically into our manufacturing and supply chain infrastructure to preserve our competitive edge*** and to ensure we are in a position to scale efficiently as demand grows.

241. Adding to Smith's comments regarding the supply chain, Defendant Behrenbruch made the following statements on the 1H Call without revealing that the FDA had already found numerous deficiencies in Telix's manufacturing and supply chain that would indefinitely delay approval of TLX250 (Zircaix):

> ***Turning to manufacturing and supply chain excellence***. I want to emphasize that radiopharmaceutical manufacturing and distribution is an extremely complex business from an operational quality and regulatory perspective. ***A robust, reliable supply chain is critical to long-term success, especially for a multiproduct portfolio like ours that's also going to one day deliver therapeutic outcomes.***
>
> This is why we've made strategic investments in selective aspects of vertical integration over the past couple of years, ***alongside deepening relationships with key strategic partners that we think are best aligned with our long-term commercial strategy***.
>
> Our investment in commercial infrastructure is starting to deliver real operational and financial returns, including with continued volume growth for Illuccix in a maturing market landscape. This performance reflects our proven track record in commercial execution and ***I think it positions us very well for future product launches***.

242. Defendant Behrenbruch continued:

> Let's take a moment to understand what transitioning from a single product, single market company to a multiproduct, multi-region commercial organization actually means. It takes a highly complex global manufacturing and distribution infrastructure to deliver our precision medicine assets and obviously, future therapeutics that are coming down the pathway to patients.

> Due to the relatively short half-lives of isotopes and the need for just-in-time manufacturing, highly specialized facilities and logistics are required to avoid factors throughout the journey that can lead to disruption and delays. ***We have continued investing in our manufacturing infrastructure globally to have greater control throughout the process and significantly reduce quality and delivery risk. We see this as a crucial point of competitive advantage because without reliability, there is no commercial traction in this industry.***

243. Defendants' statements concerning the Company's "manufacturing and supply chain excellence" by creating "deepening relationships with key strategic partners" and how that "position[ed Telix] very well for future product launches" and gave Telix a "competitive advantage" were materially false and misleading at the time they were made because, as detailed in Sections IV.D.7 and IV.D.8., Defendants knew that Telix had partnered with GBI and 3DI for the ***purported*** upcoming launch of TLX250 (Zircaix) and that the FDA had already found both of these Telix partners to be materially deficient in numerous ways such that Telix would not be able to launch TLX250 (Zircaix) after the PDUFA date at the end of August 2025. Indeed, such deficiencies in Telix's manufacturing and supply chain still remain to be fixed and Telix has not been able to resubmit a BLA for TLX250 (Zircaix).

## VI. LOSS CAUSATION

244. Defendants, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. During the Class Period, Defendants engaged in a scheme and wrongful course of business conduct that was designed to, and did, inflate the Company's stock and ADS price through attempting to push drug candidates through FDA approval without proper compliance with FDA requirements, and/or making false and misleading statements about the Company's drug candidates without disclosing material facts necessary to render those statements not false or misleading. Telix's ADSs traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth

about Telix's and Defendants' fraudulent scheme. Plaintiffs and other Class members purchased Telix's ADSs at artificially inflated prices and suffered damages when Telix's ADS price declined as the relevant truth entered the market.

245. As discussed below, the artificial inflation in Telix's ADS price was dissipated by partial corrective disclosures on April 28, 2025, July 22, 2025, and August 28, 2025, of new, Company-specific, material information. The resulting significant ADS price declines upon release of this new material information, and related increased risks, were due to Company-specific, fraud-related disclosures, and not a result of macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

246. On April 28, 2025, Telix posted an announcement on its website entitled "Telix Provides Regulatory Update on TLX101-CDx" announcing the Company had received a Complete Response Letter from the FDA requiring Telix to provide "additional confirmatory clinical evidence" to "progress the application."

247. The market reaction to the announcement was significant. Telix ADSs declined from a close of $18.80 on April 25, 2025 (the last trading day), to close at $17.57 on the next trading day April 28, 2025.

248. Analysts were quick to connect the stock price decline to the announcement of the CRL. For example, *The Motley Fool* published an article on the morning of April 28, 2025, titled: "Telix shares crash 8% on US FDA blow." Referencing prices of the Australian traded shares, the article stated:

> Telix Pharmaceuticals Ltd(ASX: TLX) shares are tumbling on Monday morning.
>
> At the time of writing, the radiopharmaceuticals company's shares are down 8% to $26.35.

> Why are Telix shares sinking?
>
> Investors have been selling the company's shares today after it was dealt a blow from the US Food and Drug Administration (FDA).
>
> According to the release, Telix has received a Complete Response Letter from the FDA for its New Drug Application (NDA) for TLX101-CDx (Pixclara). It is an investigational agent for the imaging of glioma, a rare and life-threatening brain cancer.

249. The new, Company-specific, material information released on April 28, 2025, was directly related to the false and/or misleading statements previously made by the Defendants concerning TLX101 (Pixclara).

250. On July 22, 2025, before the market opened, Telix issued a press release and filed with the SEC a current report on Form 6-K. Attached to the current report was a copy of the press release. In pertinent part, it stated the following:

> Telix has received a subpoena from the [SEC] seeking various documents and information primarily relating to the Company's disclosures ***regarding the development of the Company's prostate cancer therapeutic candidates***.
>
> The Company is fully cooperating with the SEC and is in the process of responding to the information request. At this stage, this matter is a fact-finding request. The Company has elected to notify the Australian Securities and Investments Commission of the SEC's information request. Telix's policy is not to discuss any details of an ongoing regulatory inquiry.
>
> * * *
>
> While the matter is ongoing, Telix will continue with its clinical development programs relating to its prostate cancer therapy candidates, in the ordinary course of business. The information requested does not extend to Telix's commercial and late-stage precision medicine products including Illuccix, Gozellix, Zircaix, Pixclara and Scintimun®[.]

251. On July 22, 2025, after market close, *Bloomberg* published an article entitled "Telix Shares Drop as SEC Probes Disclosures Tied to Prostate Cancer Drug Pipeline." This article stated that "[Telix] slumped as much as 16%, the most in 21 months, after the Australian developer of

radioactive drugs said it received a subpoena from the [SEC] seeking information about disclosures related to its prostate cancer therapeutic candidates."

252. Similarly, *The Motley Fool* published an article titled "Why did the Telix share price just crash 16%?" stating:

> Telix share price hit by US subpoena
>
> The Telix share price has come under heavy selling pressure today amid news the company has been issued with a subpoena from the United States Securities and Exchange Commission (SEC).
>
> As the company reported after market close yesterday, the subpoena involves disclosures related to Telix's prostate cancer therapies.

253. The SEC's investigation and subpoena focused primarily on the Company's disclosures regarding the development of its prostate cancer therapeutic candidates, specifically TLX591.

254. The fact that the SEC served a subpoena upon Telix indicates the SEC was not merely conducting an informal inquiry but had commenced a formal investigation. The SEC cannot issue subpoenas without a formal order of investigation. A formal order of investigation necessarily means the SEC believes Telix may have violated federal securities law.

255. On this news, Telix ADSs fell $1.70 per ADS, or 10.4%, to close at $14.58 on July 23, 2025. The next day, Telix ADSs fell a further $0.69 per ADS, or 4.7%, to close at $13.89 on July 24, 2025.

256. The new, Company-specific, material information released on July 22, 2025, was directly related to the false and/or misleading statements previously made by the Defendants concerning TLX591.

257. On the last day of the Class Period August 28, 2025, Telix posted an announcement on its website informing investors that the FDA had once again rejected its BLA for TLX250. The press release was entitled "Telix Provides Regulatory Update on TLX250-CDx." It stated the following:

> Telix Pharmaceuticals Limited (ASX: TLX, NASDAQ: TLX, "Telix") today announces that it has received a Complete Response Letter (CRL) from the United States (U.S.) Food and Drug Administration (FDA) for the Biologics License Application (BLA) for ***TLX250-CDx (Zircaix®[1], $^{89}$Zr-DFO-girentuximab),*** an investigational PET[2] agent for the diagnosis and characterization of renal masses as clear cell renal cell carcinoma (ccRCC).
>
> The CRL identifies deficiencies relating to the Chemistry, Manufacturing, and Controls (CMC) package. The FDA has requested additional data to establish comparability between the drug product used in the ZIRCON Phase 3 clinical trial and the scaled-up manufacturing process intended for commercial use. Additionally, the FDA has documented notices of deficiency (Form 483) issued to two third-party manufacturing and supply chain partners that will require remediation prior to resubmission.
>
> [1] Brand name subject to final regulatory approval.
> [2] Positron emission tomography.

258. On this news, the price of Telix ADSs fell $1.95 per ADS, or 16.1%, to close at $10.15 on August 28, 2025. The next day, Telix ADSs fell a further $0.60 per ADS, or 5.9%, to close at $9.55 on August 29, 2025.

259. Analysts were quick to link the stock/ADS price decline to the FDA decision on TLX250 (Zircaix). For example, *The Motley Fool* published an article titled "Telix shares just crashed 24%! Here's why" and reported:

> Telix shares tumble on FDA response
>
> Telix shares are taking a tumble after the company announced that it had received a Complete Response Letter (CRL) from the United States Food and Drug Administration (FDA).

> The FDA letter addresses Telix's Biologics License Application (BLA) for its TLX250-CDx (Zircaix) product. Zircaix is an investigational positron emission tomography (PET) agent intended to diagnose and characterise renal masses as clear cell renal cell carcinoma (ccRCC).
>
> As you can likely guess by the plunging Telix share price today, the company revealed that the FDA's response identified deficiencies relating to the Chemistry, Manufacturing, and Controls (CMC) package.

260. The new, Company-specific, material information released on August 28, 2025, was directly related to the false and/or misleading statements previously made by the Defendants concerning TLX250 (Zircaix).

261. In sum, as detailed above, Telix's significant ADS price declines described herein removed the artificial inflation from the price of Telix ADSs, and were the direct and foreseeable consequences of the revelations of the relevant truth concealed by Defendants. The declines in the price of Telix ADSs described herein were a direct result of the nature, extent, and impact of Defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of Telix ADSs negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company specific factors unrelated to Defendants' wrongful conduct.

262. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

## VII. <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

263. During the Class Period, Defendant Behrenbruch had both the motive and opportunity to commit fraud. He also had actual knowledge of the misleading nature of the statements he made or acted in reckless disregard of the true information known to him at the time.

Defendant Behrenbruch participated in conference calls and creating public disclosure documents and allowed other Telix employees to make false and misleading statements without correcting those statements. In so doing, Defendant Behrenbruch participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's ADSs during the Class Period.

264. As detailed herein, Telix and Defendant Behrenbruch knew (i) Telix's TLX101 (Pixclara) drug application to the FDA "did not provide substantial evidence of effectiveness" (*see* § IV.B.); (ii) Telix had not obtained FDA approval for a full phase 3 trial of TLX591 (*see* § IV.C.); and (iii) that Telix's BLA for TLX250 (Zircaix) had multiple material deficiencies that would preclude FDA approval (*see* § IV.D.). Accordingly, Defendants' statements to investors were made with an intent to deceive investors. A strong inference of Defendants' scienter is further supported by the following factors.

### A. <u>Defendants Were Motivated to Conceal the Truth While Telix's Co-Founders Sold Four Million Shares</u>

265. On February 27, 2025, Defendant Behrenbruch and his co-founder Andreas Kluge sold four million Telix shares for $118 million at the very peak of the Company's stock price, and before the shares were cut in half by the disclosures of the truth regarding Telix's pipeline drugs. *See* § IV.E.

266. Defendant Behrenbruch and his co-founder Kluge did not make these sales through a Rule 10b5-1 trading plan.

267. Behrenbruch and Kluge sold all four million shares in one transaction via a block sale – not over multiple trading days on the open market – to execute the sale as quickly as possible and at precisely the peak of the stock price.

268. Behrenbruch timed his sale shortly after the FDA's late-cycle meeting with Telix in which the FDA expressed that the NDA for TLX101 (Pixclara) had substantive application issues and identified those deficiencies, including: "***The clinical data submitted in this application did not provide substantial evidence of effectiveness*** . . . ." *See* § IV.B.

269. Only two days before he sold shares, Behrenbruch caused Telix to issue a press release touting that Telix was "recruiting and dosing patients in the ProstACT Global Phase 3 trial" even though Telix had not been approved for a full Phase 3 trial ***and*** Telix had been "actively dosing patients at multiple clinical trial sites" for months. *See* § IV.C.

270. Defendant Behrenbruch timed the sale of his shares to occur just one day after Telix announced the FDA accepted Telix's BLA for TLX250-CDx (Zircaix) – which Telix publicized in a press release that did not disclose (among other things) that Telix employees had presented Behrenbruch with a presentation of the deficiencies in the BLA that would ultimately cause the FDA to deny its approval. *See* § IV.D.3.

### B. <u>Behrenbruch's Refusal to Heed Expert Advice Can Best Be Explained by Fraudulent Intent</u>

271. FE-1 left Telix because FE-1 was frustrated that Telix management, particularly Behrenbruch, refused to heed FE-1 and other experts' advice.

272. According to FE-1, Telix management (including Behrenbruch) was dismissive of Telix's internal experts and of the FDA's requests for more information, which put the BLA for TLX250-CDx at greater risk of being denied.

273. For example, FE-1 advised Behrenbruch to find an alternative to GBI, but he refused to do so. Telix conducted a mock inspection of GBI (the company that manufactured the bioconjugator for TLX250-CDx) in 2024 before Telix resubmitted its BLA to the FDA in December 2024. Telix discovered numerous deficiencies at GBI. FE-1 recommended that Telix

get another manufacturer because FE-1 doubted GBI could fix the deficiencies. Defendant Behrenbruch refused to do so. Behrenbruch ordered the Telix team to go forward with the TLX250-CDx BLA regardless of the known serious deficiencies at GBI that would ultimately result in the BLA being denied.

274. Similarly, before Telix resubmitted the BLA for TLX250-CDx, Telix employees told Defendant Behrenbruch they were concerned about the quality of the zirconium provided by 3DI. Again, according to FE-1, Defendant Behrenbruch simply dismissed these risks: "Chris would justify them himself, [saying] Oh, it's ok. It's fine. It's fine." "It didn't matter what we said." "He was going to say push forward. Don't worry about it. It's fine. It was a strange way to operate." These risks ultimately resulted in the FDA's rejection of the TLX250 BLA in August 2025.

275. Behrenbruch's refusal to heed FE-1's advice to correct the problems with GBI and 3DI is consistent with Behrenbruch desiring to create the ***appearance*** of a successful drug application to artificially increase the Company's stock price before he sold shares.

276. Behrenbruch's refusal to heed FE-1's advice was inconsistent with Behrenbruch acting in the best interests of Telix and inconsistent with his own statements to investors regarding the market launch of TLX250-CDx.

**C. Defendant Behrenbruch was a "Very Hands-on CEO"**

277. FE-1 described Defendant Behrenbruch as "a very hands-on CEO for sure – he comes from a science background."

278. Further, there can be no doubt that Defendant Behrenbruch had the training and experience to appreciate the significance of the matters plaguing FDA approval of TLX101 (Pixclara), TLX591, and TLX250-CDx (Zircaix). Behrenbruch has a PhD in biomedical

engineering from the University of Oxford and over two decades of radiopharmaceutical experience, including that he founded Telix.

### D. Defendant Behrenbruch was Debriefed After Every FDA Meeting

279. According to FE-1, Telix's James Stonecypher was the Chief Development Officer at Telix, and he was in direct communications with the FDA about drugs in the pipeline. According to FE-1, "James talked directly to the FDA at every meeting."

280. Further, according to FE-1, "After every FDA meeting, we would have an immediate debrief." Defendant Behrenbruch "would join these" meetings.

281. FE-1 was a part of these debriefing meetings.

282. FE-1 heard Stonecypher report to Behrenbruch the questions and concerns the FDA had raised.

### E. The FDA was in Regular Contact With Telix

283. The time between submitting an application to the FDA and the FDA's final decision on a drug application is not a black box.

284. To the contrary, the FDA maintains strict requirements for communications to sponsors of drug applications granted priority review such as Telix's TLX101-CDx and TLX250-CDx, which are set forth in the FDA's "Review Process Desk Reference Guide." *See* Ctr. for Drug Eval. & Rsch., CDER 21st Century Review Process Desk Reference Guide: New Drug Application and Biologics License Application Reviews ("CDER Review Process") available at https://www.fda.gov/media/78941/download.

285. The CDER Review Process includes a "Formal Communication Plan" with elements such as mid-cycle communication and late-cycle meetings during NDA/BLA review.

286. Defendants would not have been surprised by the FDA's decisions, but rather informed throughout the process of what deficiencies the FDA found problematic to the approval of Telix's pipeline drugs.

287. The formal requirements of the CDER Review Process are consistent with the account of FE-1, who indicated that Telix met with the FDA a number of times in 2025 to discuss the FDA's requests and concerns. "We had quite a few meetings during the review period with them trying to address some of their concerns. It was pretty clear in those meetings they [the FDA] had serious concerns."

### F. Telix's Pipeline Drugs Were of Critical Importance to the Company

288. Defendants told investors that the Company's new drugs in the pipeline – TLX101-CDx (Pixclara), TLX591, and TLX250-CDx (Zircaix) – were very important to the Company's future growth. We can thus infer Defendants actually paid attention to what was happening with these drugs.

289. For example, in the 2024 Annual Report Behrenbruch wrote to investors that the Company's new "strategy is evident in our execution. We filed three new drug applications for Px products that have the potential to significantly impact the standard of care while super-charging Telix's cash generation capability."

290. Given the importance of these new drug applications to Telix, Defendants would have been most keenly aware of what was going on with them.

## VIII. CLASS ACTION ALLEGATIONS

291. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Telix ADSs publicly traded on the NASDAQ during the Class Period, and who were

damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Telix, members of Defendant Behrenbruch's immediate family and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

292. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Telix ADSs were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

293. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

294. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

295. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Telix;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused Telix to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of Telix ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

296. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

297. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Telix shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;
- As a public issuer, Telix filed periodic public reports;
- Telix regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

- Telix' ADSs were liquid and traded with moderate to heavy volume during the Class Period; and
- Telix was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

298. Based on the foregoing, the market for Telix ADSs promptly digested current information regarding Telix from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

299. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## IX. CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

300. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

302. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

303. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Telix ADSs during the Class Period.

304. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Telix were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Telix, their control over, and/or receipt and/or modification of Telix' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Telix, participated in the fraudulent scheme alleged herein.

305. Defendant Behrenbruch, who is the CEO of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless

disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Telix personnel to members of the investing public, including Plaintiffs and the Class.

306. As a result of the foregoing, the market price of Telix ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Telix ADSs during the Class Period in purchasing Telix ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

307. Had Plaintiffs and the other members of the Class been aware that the market price of Telix ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Telix ADSs at the artificially inflated prices that they did, or at all.

308. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

309. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Telix ADSs during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against Defendant Behrenbruch

310. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

311. During the Class Period, Defendant Behrenbruch participated in the operation and management of Telix, and conducted and participated, directly and indirectly, in the conduct of Telix' business affairs. Because of his senior position, he knew the adverse non-public information about Telix's business practices.

312. As an officer and director of a publicly owned company, Defendant Behrenbruch had a duty to disseminate accurate and truthful information with respect to Telix' financial condition and results of operations, and to correct promptly any public statements issued by Telix which had become materially false or misleading.

313. Because of his position of control and authority as a senior officer, Defendant Behrenbruch was able to, and did, control the contents of the various reports, press releases and public filings which Telix disseminated in the marketplace during the Class Period concerning Telix' results of operations. Throughout the Class Period, Defendant Behrenbruch exercised his power and authority to cause Telix to engage in the wrongful acts complained of herein. He therefore was a "controlling person" of Telix within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Telix ADSs.

314. By reason of the above conduct, Defendant Behrenbruch is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Telix.

## X. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 27, 2026

By: ______________________

Brad A. Catlin, Atty No. 21570-29
**WILLIAMS LAW GROUP, LLC**
1101 N. Delaware Street
Indianapolis, IN 46202
Phone: (317) 633-5270
brad@williamsgroup.law

*Liaison Counsel for co-Lead Plaintiff Song Chee Tan and the Class*

Phillip Kim (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
philkim@rosenlegal.com

Matthew Siben (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A**.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Fax: (213) 226-4684
msiben@rosenlegal.com

*Counsel for co-Lead Plaintiff Song Chee Tan co-Lead Counsel for the Class*

**STOLL KEENON OGDEN PLLC**
Offer Korin, No. 14014-49
Brooke Smith, No. 32427-0
334 N. Senate Avenue
Indianapolis, IN 46204-1708
Office: 317-464-100;
Fax: 317-464-1111
offer.korin@skofirm.com
brooke.smith@skofirm.com

*Liaison Counsel for co-Lead Plaintiff Tracy Tripp and the Class*

Charles H. Linehan (*pro hac vice* to be filed)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Fax: (310) 201-9160
clinehan@glancylaw.com

*Counsel for co-Lead Plaintiff Tracy Tripp and co-Lead Counsel for the Class*

Frank R. Cruz (*pro hac vice* to be filed)
**THE LAW OFFICES OF FRANK R. CRUZ**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for co-Lead Plaintiff Tracy Tripp*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2026, a copy of the foregoing Consolidated Complaint was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

By: ______________________________
Brad A. Catlin, Atty No. 21570-29
**WILLIAMS LAW GROUP, LLC**
1101 N. Delaware Street
Indianapolis, IN 46202
Phone: (317) 633-5270
brad@williamsgroup.law